# SUPREME COURT

OF THE

# STATE OF MISSOURI,

AT THE

APRIL TERM, 1894.

---

BELL, *Appellant*, v. CAMPBELL *et al.*

Division Two, June 12, 1894.

| 123 | 1 |
|-----|-----|
| 147 | 226 |
| 150 | 270 |

| 123 | 1 |
|-----|-----|
| 166 | 433 |

| 123 | 1 |
|-----|-----|
| 172 | [1]288 |
| 172 | [2]293 |

| 123 | 1 |
|-----|-----|
| 101a | [1]419 |

1. **Mortgage:** CANCELLATION: UNDUE ADVANTAGE: EQUITY. Where a woman, seventy years of age, inexperienced in business and illiterate, is induced by her son-in-law and the sureties upon his official bond to execute a mortgage on her land to indemnify the sureties on defalcation by the son-in-law by holding out to her the probable punishment of the latter, without affording her a chance to consult any disinterested friend, the mortgage will be set aside.

2. ——: ——: ——: ——. The fact that she executed the mortgage with the purpose of protecting her son-in-law from criminal prosecution will not bar her from relief on the ground that she was *in pari delicto*, as she can not be regarded as equally culpable with the defendants.

3. ——: ——: ——: LACHES: LIMITATION. The fact that she did not move for relief until after the statute of limitations barred any prosecution of the son-in-law, the mortgage not having matured, will not deprive her of relief, as she will be deemed to have acted under the original constraint.

VOL. 123—1                                                      (1)

4. ———: ———: ———: ESTOPPEL. The sureties, in an action by plaintiff to set aside such mortgage, can not successfully set up as a defense that she failed to reconvey land deeded to her by the son-in-law during the transaction and at the same time deny that they are chargeable with anything the son-in-law did in the matter.

5. ———: ———: ———: DECREE. Where the plaintiff in a suit to set aside a mortgage tenders a quitclaim deed of land conveyed to her as a part of the same transaction, the court can compel a conveyance as the price of a decree in her favor.

6. Note: INDORSEMENT OF INTEREST: PRESUMPTION. While an indorsement of the payment of interest on a note is *prima facie* evidence of such payment by the maker, such presumption is repelled by the testimony of the maker to the contrary.

7. Supreme Court Practice: EQUITY CASE: REVIEWING RULINGS AND EVIDENCE. While the supreme court will in an equity case defer somewhat to the trial court's finding of facts, yet it will review the latter's rulings and the evidence offered in their support.

*Appeal from Buchanan Circuit Court.*—HON. H. M. RAMEY, Judge.

REVERSED AND REMANDED.

The correctness of the abstract in this case, prepared by counsel for plaintiff is virtually conceded by counsel for defendants, who refer to the same from time to time, in verification of their statement. From that abstract we gather the following as the substance of the pleadings and evidence:

By this proceeding, plaintiff sought to prevent the sale of her farm under a deed of trust to defendant, Campbell, as trustee for the Saxton National Bank and two others. This deed was dated June 25, 1888, and was given to secure three promissory notes of equal amounts aggregating $7,700, due in three years, at eight per cent. payable every ninety days, given by plaintiff to the several beneficiaries aforesaid. And plaintiff also sought to cancel such notes and deed of trust on the ground that they had been obtained by

undue influence, improper practices, etc. The answer was tantamount to the general issue. Carter, though a defendant, did not answer. Pending litigation, the property in question was sold under the deed of trust, and Stephen C. Woodson, the vice-president of the Saxton Bank, bought in the property for $5,000, and thereupon credits of $1,632.46, each dated August 7, 1891, were indorsed on the several notes, as the product of that sale, less costs, etc. Also indorsements were made on the notes showing interest payable from time to time up to March 25, 1891. *Under* the signature of plaintiff on the notes payable to the Saxton National Bank appeared the signature of Henry C. Carter. Carter was the son-in-law of plaintiff, he having married her daughter Alma Bell, by whom he had a child, the parties having been married some twenty years.

Plaintiff was a widow, ignorant, illiterate, unaccustomed to the ways of the world, or with business affairs, and some seventy years of age at the time the transactions which gave origin to the present litigation occurred. She had left the farm, her little all, and had moved to the city and lived close by her son-in-law, Carter, who, it seems, enjoyed her confidence and attended to her affairs, though her son, his wife and two children lived in the same house with her.

In 1875, plaintiff's husband directly deeded to her the litigated property, and, in 1884, he having died, she occupied it as her homestead until 1887, when she moved to the city. Carter, prior to June, 1888, was treasurer of the city of St. Joseph, and in that capacity had defaulted in the sum of $7,700, His bondsmen were Adam N. Schuster, Louis Hax and S. A. Walker, of the Schuster-Hax National Bank, Stephen C. Woodson, J. W. McAllister and A. M. Saxton, of the Saxton National Bank, and Calvin F. Burnes, of the National

Bank of St. Joseph. At that time Schuster and Burnes were presidents, Woodson a vice president, and Walker a cashier. Shortly after the defalcation, it was agreed between Woodson, Burnes, Walker and Carter that each of the three banks should lend Carter one-third of the money, and that they would accept a joint deed of trust on the Bell farm. There is nothing to show that plaintiff was informed of this agreement or consulted with in reference to it. Nor does it appear that she had any notice about Carter's defalcation, until some three or four days before she signed the instruments sought to be canceled, or was in any respect informed respecting the responsibility she was soon to be called upon to assume.

Carter, confronted with his defalcation and its consequences, formed a plan for raising money to make that defalcation good, and with a view to that, determined to have an abstract of the title to the farm of plaintiff made, which was done by Hedenberg early in April, 1888, and, in order to make the title perfect in every particular, solicited quitclaim deeds from the Bell heirs to the plaintiff, without her knowledge, and, carefully concealing his purpose from the heirs. With this end in prospect, he wrote letters stating to them that plaintiff wished to sell the farm, but could not do so without quitclaim deeds from them, and also went on a trip to Andrew county to see a sister-in-law. Accompanying him was a detective whom the chief of police sent with him, fears being entertained from his manner and actions that he would commit suicide. Very close surveillance was kept over him by the detective on this account; in fact, while on this mission he was in a state of semi-arrest.

Carter, failing to procure deeds from the heirs as he desired, sent for plaintiff a few days before the deed of trust was executed, that is to say about the

Bell v. Campbell.

twenty-first of June, 1888, to call at his house. She called, and then his importunities began. He disclosed to her his situation, the amount that he was liable for to the city, his inability to raise the sum without her help, the likelihood that he would be sent to jail unless the money were obtained, and then implored her to save him from disgrace by giving a mortgage on her farm, which she stoutly refused to do. Again and again he renewed the attack during the space of four days, and, taking plaintiff by the hand, he got on his knees and begged her to give the mortgage on her farm or else he was ruined, but plaintiff steadfastly refused. About 8 o'clock on the morning of June 25, 1888, while plaintiff and her daughter-in-law were clearing off the breakfast table, Carter came in there, requested to see plaintiff when at leisure, then passing on into the sitting room where he paced backwards and forwards, uttering groans that were heard in the dining room. A few moments later Carter's son "Lolly" came in and told plaintiff that his father said he would never leave her house; he would cut his throat before he would leave the house if she did not sign the deed. Carter thereupon told plaintiff that he had come to her for the last time; that if she did not sign the deed, she would have to care for his family, etc., appealing to her to help him by all the considerations likely to touch a parent's, and especially a mother's, heart. His wife and child were there, also, while Carter was beseeching plaintiff to come to his rescue, and united their prayers with his.

Of this, plaintiff testifies his child came and said: "'Grandma, what will we do?' and said his father would never leave the house; and directly she came (Mrs. Carter). * * * I says, Harry, I can not do it; and he paced the floor back and forth, until his family came and excited me to death; * * * he was there and she was there, and she was just going on; she

did not know anything, in fact." While plaintiff was thus surrounded by all these distressing circumstances, Carter left at about 11 o'clock and called at the mayor's office, requesting Mr. Englehart to call at his house and endeavor to relieve the distress of his wife. The mayor replied that he could only say to her that he would not suspend him from the office of auditor, to which he had been recently elected, if his shortage as treasurer was made good. This, Carter thought, would "relieve her mind," and the mayor replied, "I will come up after a while."

Carter also had another call to make before his return, and he made it. It was upon S. C. Woodson. The purpose of that call is best explained in the language of that witness, who says: "On the evening preceding my going, Mr. Carter came to me, and said his wife was very much distressed, and asked me if I would not go up and see if I could not pacify her about this matter, stating that he had made arrangements by which the notes would be executed to these different parties, and I told him that I would go when he so desired." Carter at once called upon Mr. Woodson to keep his promise of the day before, and they went to the house together, the mayor following shortly after, alone. Why Englehart and why Woodson were called upon to visit Mrs. Carter "to pacify her" or "relieve her distress," seeing that they were entire strangers to her, is not explained. On his arrival, Woodson entered the parlor, and Carter calling his wife from the sitting room, introduced her to him. At this point Woodson says: "She was right smartly distressed, and had an impression that they were going to prosecute her husband and try to send him to the penitentiary, and she was disturbed over that, and that was what we had gone there for, to try to pacify her and satisfy her that there was no probability of their sending him to the penitentiary."

With the understanding that all arrangements for the execution of the mortgage had been made, Woodson entered upon his duties as *pacificator;* he says: |"I told Mrs. Carter I did not think there would be any disposition upon the part of any of *these parties* to prosecute Mr. Carter.

While thus engaged, Mrs. Carter being much excited and weeping, plaintiff entered the room, and shortly thereafter Mrs. Carter fainted or swooned, and Woodson, according to plaintiff and the younger Mrs. Bell, exclaimed to plaintiff: "Mrs. Bell, how can you stand this, to see your child suffer like that? Do you think I could stand that? No, not for my right arm!" Woodson, however, denies this. Restoratives having been applied, Mrs. Carter was removed from the parlor into the sitting room and placed on a lounge. Open folding doors furnished communication between these rooms, and Mrs. Carter was within ten feet of the doors. At this juncture Englehart arrived upon the scene. He too was one of the chosen comforters of Mrs. Carter and he says he found Woodson and Carter there in the parlor and Mrs. Carter on the lounge in the adjoining room, where she remained, emitting sighs and groans, and was evidently in great mental distress.

No surprise appears to have been occasioned by the meeting of these two men, though not apprised of each other's coming, or of the object of their mutual visit. Nor does Englehart seem to have been informed of what had occurred just prior to his arrival. Soon after Englehart's arrival, the subject of Carter's shortage came up and was the subject of general conversation, during which, true to his promise, Englehart, the mayor, "speaking sufficiently loud for Mrs. Carter to hear," said: "that considerable pressure had been brought to bear upon him to suspend Carter from office, but that he would not suspend him as auditor if his shortage as

treasurer was made good." The effect of this upon Mrs. Carter was not apparent, but about this time plaintiff, who was with Mrs. Carter in the sitting room, entered the parlor, and after some conversation with the mayor upon the subject of the shortage, asked what he would advise her to do in the matter of signing a mortgage; and he replied, "Mrs. Bell, I can not advise you in that matter." This was the only appeal that plaintiff made; there was no one else to whom she could appeal; and the mayor says: "She seemed to be pretty calm, sir; not much excited—no more than the case would warrant."

Woodson and Englehart left simultaneously. They were not dismissed from the house, nor did their ideas of the requirements of the occasion prompt them to say so much as "good bye" to anyone on taking their departure. However, Woodson offers a seeming excuse for the incivility of thus leaving by saying, "*Well, Mrs. Carter was very much excited.*" On their way homeward, very little was said between these parties about the recent occurrences at the house.

Hedenberg, conveyancer and notary, then entered his appearance at the home of plaintiff. He had been employed, as already stated, to prepare the abstract, and subsequently he had also been directed by Carter to prepare three notes for the aggregate sum of $7,700, due in three years, with a deed of trust upon the Bell farm; also to prepare a warranty deed from Carter to plaintiff. Hedenberg called with these papers immediately after the departure of Woodson and Englehart, and found plaintiff in the sitting room and Mrs. Carter still on the lounge. After some conversation with the plaintiff he concluded that *it would not be proper to take her acknowledgment, that she would not sign the deed willingly,* and he started to leave. Going into the parlor and picking up his hat, he waited for Carter, who had

lingered in the sitting room. During this time, according to Hedenberg, a conversation between plaintiff and someone was going on in there that he did not hear so as to know what was said, but it is evident that the younger Mrs. Bell refers to this conversation when she says: "Mr. Carter said: 'We must hurry, mother; Mr. Englehart has to leave the city at 2 o'clock,'" etc. Here Mrs. Carter left the lounge and the room. In a few moments Hedenberg was recalled, but by whom *he cannot tell*. Mrs. Carter was gone. Seated at a small table with the papers all laid out together, Hedenberg signed and witnessed plaintiff's name, and she, much agitated, "in a flurry," stepped to his side, and touched the pen while standing.

The confusion and excitement then prevalent in that little household is shown in a very pronounced manner in the testimony of these women, for both roundly declare that but one paper was signed, and the younger says that Hedenberg signed it standing. These notes and deeds of trust being signed and acknowledged by plaintiff, then for the first time, the warranty deed from Carter was mentioned; plaintiff speaks of it as a *mortgage;* in fact, in respect to all these papers that she received, she says that "they was mortgages on Mr. Carter's property." Hedenberg told her he would attend at once to its execution, and leaving the notes, took with him the deed of trust and warranty deed. At this time he had no knowledge of the $7,700 note from Carter and wife which he afterwards unwittingly delivered to plaintiff.

Having certified at his office the acknowledgments of all parties to these deeds, Hedenberg handed the deed of trust to Carter. Carter took it, the note to the Saxton Bank and the abstract to Woodson. When this note came to Woodson it alone of the three had Carter's name on it. Where this name was signed

does not appear, and neither plaintiff nor Mr. Hedenberg had any knowledge whatever of the fact.

After Woodson had approved the loan and directed a credit to the Schuster-Hax Bank, Carter handed the abstract to Hedenberg, who, later in the day, personally delivered it and the warranty deed to the plaintiff. Among these papers was afterwards found this $7,700 note. Hedenburg did not know it was among them, and it is clear from plaintiff's testimony that she was not aware of it. In fact she seems never to have known she had it, or to have understood the character of any of these papers. She put them away, never recorded the deed, and they were not examined until furnished to her counsel just before the institution of this suit.

On the next day, June 26, Carter handed the other two notes to Mr. Walker of the Schuster-Hax Bank. These notes were made to Burnes and Schuster, and by them indorsed to their respective banks. After ascertaining from Woodson that he had secured the mortgage on the Bell farm, had it recorded, etc., Walker got a cashier's check from the National Bank of St. Joseph, and credited $7,700 to Carter's account as treasurer.

About eight months after the signing of these papers, plaintiff's son left her and went to himself, and she moved to, and has ever resided in, Carter's house. Interest was regularly paid to the three banks, but not by the plaintiff, nor out of her money. She heard nothing of the notes until maturity. Upon her failure to pay, the property was advertised, and at the sale Mr. Woodson became the purchaser. In the meantime, however, a son-in-law, McGee came in from Oberlin, Kansas, found the farm advertised for sale, and the plaintiff living with Carter. After a brief consultation with her this suit was brought. There was no

evidence as to the value of the farm except that it brought $5,000 at the trustee's sale.

Other facts, if necessary, will be adverted to further on. The court below dismissed plaintiff's petition; hence this appeal.

*Stephen S. Brown* and *James F. Pitt* for appellant.

Whatever destroys free agency and constrains the person whose act is brought in judgment to do what is against his will, and what he would not have done if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity, or any other species of mental or physical coercion. *Turley v. Edwards,* 18 Mo. App. 676; *Sharon v. Gager,* 46 Conn. 189; *Eadie v. Slimmon,* 26 N. Y. 9; *Foley v. Green,* 14 R. I. 618; s. c., 51 Am. Rep. 419; *Jordan v. Elliott* (Pa. 1882), 15 Cent. L. J. 232; *Meech v. Lee,* (Mich. 1890), 46 N. W. Rep. 383. (2) Plaintiff has not been guilty of delay or laches which would bar her recovery. *Gowland v. DeFaria,* 17 Ves. 20; *Buck v. Bank,* 27 Mich. 293; *Sumner v. Summers,* 54 Mo. 340.

*Porter & Woodson* and *B. R. Vineyard* for respondents.

(1) To establish duress or undue influence in procuring a deed or any other contract formally executed, requires proof that is strong, clear, convincing, and leaves no ground for reasonable doubt in the mind of the chancellor. *Atkinson v. Henry,* 80 Mo. 157; *Jackson v. Wood,* 88 Mo. 78; *Linnenkemper v. Kempton,* 58 Md. 159. In cases of duress or undue influence the certificate of acknowledgment of the officer to the deed "makes out a *prima facie* case that the execution was a voluntary act." *Clark v. Edwards,* 75 Mo. 87, 89 at top; cited approvingly in *Webb v. Webb,* 87 Mo.

540; *Bennett v. Davis*, 104 Mo. 555, at bottom; *Rust v. Goff*, 94 Mo. 511. (2) While it would seem unnecessary, in a case like this, where the decision of the court is so manifestly just, to call the court's attention to the rule now so well settled, that the supreme court will defer considerably to the findings of fact by the trial court in chancery proceedings, yet we do so by citing the following authorities: *Chouteau v. Allen,* 70 Mo. 336; *Erskine v. Lowenstein*, 82 Mo. 309; *Springer v. Kleinsgorge*, 83 Mo. 159; *Berry v. Hartzell*, 91 Mo. 138; *Bushong v. Taylor*, 82 Mo. 666; *Mathias v. O'Neill*, 94 Mo. 530. (3) Before one can exercise the right of rescission of a contract, the plaintiff, before bringing suit, must tender back all that he may have received. And in case land has been conveyed to plaintiff on the faith of the contract, a deed must be made reconveying the land, and a delivery of the deed, or offer to deliver the deed, must be shown. This is prerequisite to the right to sue. *Cahn v. Reid*, 18 Mo. App. 115; *Pearsal v. Chapin*, 44 Pa. St. 9; *Jarrett v. Morton*, 44 Mo. 275; *Cobb v. Hatfield*, 46 N. Y. 536; *Wells v. Gates*, 6 Mo. App. 244; 2 Greenleaf on Evidence, sec. 602; *Bronson v. Turner*, 77 Mo. 494; *Pershing v. Canfield*, 70 Mo. 143; *Turner v. Ogden*, 1 Black (U. S.) 450. (4) The record in this case fails to show any duress of the person of Carter, or anyone else. There is no pretense that anyone threatened him with personal violence, or even threatened him with any criminal prosecution. See the closing part of defendant's statement, *supra*, and references therein to the record. *Dausch v. Crane*, 109 Mo. 332; *Wolfe v. Marshall*, 52 Mo. 167; *Claflin v. McDonough*, 33 Mo. 412; *Davis v. Luster*, 64 Mo. 43; 69 Ala. 98; *Mundy v. Whittemore*, 15 Neb. 647; *Lefebvre v. Dutruit*, 51 Wis. 326. It is held on good authority, that, even if Carter's arrest and imprisonment had been threatened, unless

accompanied with the statement that the prosecution had been already begun, such fact would not have avoided plaintiff's contract. *Buchanan v. Sohlein*, 9 Mo. App. 552; *Harmon v. Harmon*, 61 Me. 227; *Higgins v. Brown*, 78 Me. 473. (5) The right to rescind a contract on account of fraud or duress, must be exercised promptly on the discovery of the fraud or the removal of the duress. Delay is destructive of the right. *Taylor v. Short*, 107 Mo. 384; *Estes v. Reynolds*, 75 Mo. 563; *Cahn v. Reid*, 18 Mo. App. 123; *Lapp v. Ryan*, 23 Mo. App. 439; *Hart v. Handlin*, 43 Mo. 175; *Grymes v. Sanders*, 93 U. S. 55; *Plympton v. Dunn*, 148 Mass. 523; *Beeteni's Adm'r v. Burkholder*, 69 Pa. St. 249; *Burtle v. Levy*, 70 Cal. 250; *Disbrow v. Secor*, 58 Conn. 35; *Hunt v. Hardwick*, 68 Ga. 100. (6) Duress to constitute a good defense, must have been brought about by or at the instance of the promisee or grantee who furnished the consideration for the agreement. *Lefebvre v. Dutruit*, 51 Wis. 326; *Compton v. Bank*, 96 Ill. 301; *Ins. Co. v. Franks*, 53 Iowa, 618; *Moog v. Strong*, 69 Ala. 98. (7) Where a person has committed a crime, a threat to have him arrested and imprisoned, being only a threat of a lawful arrest, will not constitute duress, in any such sense as will discharge him or others, acting in his behalf, from liability upon a contract to indemnify those injured by the commission of the offense. *Davis v. Luster*, 64 Mo. 43; *Hilborn v. Bucknam*, 78 Me. 484; *Compton v. Bank*, 96 Ill. 301; *Mascolo v. Montesanto*, 61 Conn. 55; *Plants v. Gunn*, 2 Woods, 372; *Eddy v. Herrin*, 17 Me. 338; *Green v. Scranage*, 19 Iowa, 461. But, as previously stated, there were no threats of any criminal proceeding proved in this case to have been made against Carter, and this rule of law need not be invoked here. (8) In order to invalidate a contract entered into through threats, it must appear that the menace was of

an unlawful prosecution.  *Harmon v. Harmon*, 61 Me. 227; *Mascolo v. Montesanto*, 61 Conn. 55.

SHERWOOD, J.—Upon the facts thus presented, a conclusion is to be reached and announced whether plaintiff is entitled to any relief.

That plaintiff owed the city nothing and the beneficiaries in the deed of trust nothing, stands conceded. That Carter's bondsman owed the city $7,700 is equally undisputed.  And yet this was the sole basis and the groundwork upon which plaintiff was so persistently and constantly importuned for days and days to surrender her little all; to beggar herself in order that the bondsmen might be saved harmless and she made poor indeed.  On the very morning that this most indefensible transaction found its blameworthy consummation, this poor, ignorant, illiterate old woman, fast verging on the biblical limit of three score years and ten, for over three hours was kept on the rack of varying emotions.  Within that time every argument that could be advanced, was used, every chord of human feeling and affection that could be played upon was struck by the sordid hand of self interest or the tremulous hand of anticipated punishment in the endeavor to swerve her from her purpose; how well it succeeded is matter now of record.

The circumstances of this case clearly bring it within the operation of the principle that condemns and avoids a contract entered into where the obligor is not a free agent; where he stands *in vinculis;* where he is not equal to the task of protecting himself; where the circumstances which surround him at the time are of such extreme necessity or of distress that his will is overcome, his free agency destroyed by some oppression or fraudulent advantage or imposition incident to the transaction; in such case a court of equity will

protect him, by setting aside the contract thus made. 1 Story's Equity Jurisprudence [13 Ed.], sec. 239.

In instances like the present, where surprise and sudden action are the chief ingredients, where due deliberation is, therefore, wanting, these incidents are classed by courts of equity under the head of fraud or imposition. Wherever undue advantage is taken of party "under circumstances which mislead, confuse or disturb the just result of his judgment, and thus expose him to be the victim of the artful, the importunate, and the cunning," where "proper time is not allowed to the party and he acts improvidently, if he is importunately pressed, if those in whom he places confidence make use of strong persuasions, if he is not fully aware of the consequences, but is suddenly drawn in to act, if he is not permitted to consult disinterested friends or counsel before he is called upon to act in circumstances of sudden emergency or unexpected right or acquisition,—in these and many like cases, if there has been great inequality in the bargain, courts of equity will assist the party upon the ground of fraud, imposition, or unconscionable advantage." Ib., sec. 251, and cases cited.

Other cases announce the same principle and its application to like circumstances as are here presented. *Turley v. Edwards*, 18 Mo. App. 676; *Sharon v. Gager*, 46 Conn. 189; *Foley, v. Greene*, 14 R. I. 618; *Jordan v. Elliott* (Penn.) 15 Cent. L. J. 232; *Meech v. Lee* 46 N. W. Rep. (Mich.), 383; *Eadie v. Slimmon*, 26 N. Y. 9; *Coffman v. Bank*, 5 Lea, 232; *Berlien v. Bieler*, 96 Mo. 491.

The true question as announced by Lord ELDON in *Peel v. ——*, 16 Ves. 157, in all such cases is, "whether the mind was not so subdued, that though the *execution* was the free act of that person, it was an

act, speaking the mind, *not* of *that person*, but of *another*."

In *Earle v. Norfolk, etc., Co.*, 36 N. J. Eq. 192, VAN FLEET, V. C., aptly epitomizes this whole doctrine when he says: "Whatever destroys free agency and constrains the person whose act is brought in judgment to do what is against his will, and what he would not have done if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity, or any other species of mental or physical coercion."

The testimony in this case shows in the most indubitable manner that the act of plaintiff in touching the pen and in acknowledging the deed and the notes, was purely *automatic* and *perfunctory*. It is urged that if the deed of trust and notes executed by plaintiff had been given through fear of Carter's criminal prosecution and in order to prevent the same, that then she stands *in pari delicto* with the other parties to the transaction, and, therefore, could have no relief against the enforcement of those writings obligatory.

There are two answers to this contention: *First*. Granting that plaintiff did enter into the contrract with that purpose in view, she will not be debarred from pursuing her remedy, because she can not in any event be regarded as equally culpable with the adversary parties. When this is the case, a court of equity will interfere and go to the relief of the less guilty party, whose transgression has been brought about by the imposition, undue influence, etc., of the party on whom the burden of the original blameworthiness principally rests. 2 Pomeroy's Equity Jurisprudence [2 Ed.], sec. 942; 1 Story's Eq. Jur. [13 Ed.], sec. 300; *Pinckston v. Brown*, 3 Jones' Eq. (N. C.) 494; *Kitchen v. Greenabaum*, 61 Mo. *loc. cit.* 115. *Second*. For reasons already given, plaintiff can not be regarded

as having entered into a binding contract that can prejudice her rights.

It is insisted that plaintiff should have moved more promptly for cancellation of the alleged contract; but we fail to appreciate the force of this position, because the notes had three years to run, *evidently made so for a purpose.* The statute of limitations would bar any prosecution of Carter at the end of that period. During that time the same prospect of family disgrace was held over plaintiff that was used originally to procure, and was such a potent factor in procuring, the execution of the securities, and if plaintiff had instituted her proceedings for relief at an earlier date, she would have been confronted by the same situation, the same circumstances of moral duress and imposition which confronted her in the first instance. In such circumstances, her failure to move sooner in the matter is not to be accounted acquiescence on her part. On this topic SIR WM. GRANT, M. R., said: "There is, I believe, no case in which, during the continuance of the same situation in which the party entered into the contract, acquiescence has ever gone for anything: it has always been presumed, that the same distress, which pressed him to enter into the contract, prevented him from coming to set it aside; that it is only when he is relieved from that distress, that he can be expected to resist the performance of the contract." *Gowland v. De Faria,* 17 Ves. 20.

In *Buck v. Bank,* 27 Mich. 293, the note had been given for money of which the defendant claimed her son had robbed the bank, and that such note had been executed upon an understanding that the bank would use its influence to mitigate any punishment the son had incurred a liability in receiving, and in a suit on that note the plaintiff bank was allowed to show that

when interest on the notes was arranged before the principal became due, defendant did not object to the payment of the notes. But the court said: "We think no such presumption could safely be drawn from this evidence. The notes were negotiable, and if the bank officers should be apprised of an intended defense before they fell due, it would be reasonable to expect they would endeavor to protect themselves by negotiating them. The makers of the notes were consequently interested in keeping silent regarding their defense, and it is as legitimate to refer their action to prudence as to any other motive. The evidence, we think, should not have been received. And for the same reason no inference against the *bona fides* of the defense could safely be drawn from the mere fact of the payment of interest by the makers of the notes, before the maturity of the principal. To disclose their defense at that time would have been to defeat it, so far, at least, as concerned the principal."

On this point of acquiescence, or seeming acquiescence, Judge STORY says: "But if the party is still acting under the pressure of the original transaction or the original necessity, or if he is still under the influence of the original transaction, and of the delusive opinion that it is valid and binding upon him; then, and under such circumstances, courts of equity will will hold him not barred from relief from any such confirmation." 1 Story's Eq. Jur., sec. 345.

As a further proof of plaintiff's acquiescence in the alleged contract, the notes are offered in evidence showing indorsements of interest paid thereon. While these indorsements are *prima facie* evidence of payment by the maker, such presumption is rebutted by testimony of plaintiff that she had never had the money to make even one of the payments. Conduct evincing the same sort of cunning is exhibited in the note to the

Saxon Bank, being surreptitiously signed by Carter as co-maker with plaintiff, though no one could tell how or when it was signed by him.

Defendants claim that plaintiff could not exercise the right of rescission without tendering back all she received from Carter, to wit, the warranty deed and note for $7,700. Plaintiff never asked for this deed or note; they were simply part and parcel of an adroit scheme to make an *apparent show* of a consideration for plaintiff's execution of the deed of trust and the three notes, and were dexterously foisted on plaintiff for that purpose. The evidence shows very clearly that the warranty deed and the note of Carter's for $7,700 were executed *after* plaintiff had executed the three notes and deed of trust, and that she made no use of them and never recorded the deed, and in fact did not even know its nature; thought it was a *"mortgage."* But it does not lie in defendants' mouths to set up this claim about Carter's property, and still at the same time deny, as they do, that they are chargeable with anything Carter did in the transaction. Such inconsistent positions will not be tolerated in a court of justice. *Brown v. Bowen,* 90 Mo. *loc. cit.* 190; *McClanahan v. West,* 100 Mo. *loc. cit.* 322, and cases cited.

Nor does it concern defendants in regard to the land of Carter described in the warranty deed; it is not involved in this litigation. A similar ruling was made in *Meech v. Lee, supra.*

Again, the same considerations which would go to overthrow the original contract, would necessarily destroy the one alleged to be auxiliary thereto. Plaintiff could not procure the cancellation of the first, and still retain the benefits of the second, nor would the trial court allow her to do so, in the event a decree went for her.

Moreover, plaintiff in her petition recognized this, in which she tendered to Carter a quitclaim deed for the property that he had conveyed to her, and under this tender the circuit court could have compelled a conveyance and made it the price of the decree it gave her. *Whelan v. Reilly*, 61 Mo. 565, and cases cited; *Dwen, Ex'r, v. Blake, Ex'r*, 44 Ill. *loc. cit.* 141, and cases cited.

Finally, defendants assert that we ought to defer somewhat to the conclusions reached by the lower court; but, while we do this, we do not neglect to review its rulings and the evidence offered in their support; to do otherwise would be to abdicate our jurisdiction in chancery causes. *Benne v. Schnecko*, 100 Mo. *loc. cit.* 258; *McElroy v. Maxwell*, 101 Mo. *loc. cit.* 308 *et seq.; Berlien v. Bieler*, 96 Mo. 491.

The premises considered, we reverse the decree of the lower court dismissing plaintiff's petition, and remand the cause with directions to take an account of the rents and profits of the farm as is usual in case of a mortgagee in possession, and having adjusted this matter, then to enter a decree cancelling the deed of trust and notes secured thereby, and to take such other steps as may be necessary and not inconsistent with this opinion, in which shall be included the bringing in as a party defendant of the purchaser of Mrs. Bell's farm, and the ascertainment and reconveyance by quitclaim deed of whatever land or other securities Mrs. Bell may have received from Carter. All of this division concur.