CLARK, C. J., files concurring opinion; ALLEN and BROWN, JJ., dissenting opinions.
Action to recover the penalty under Revisal, sec. 1951, for knowingly charging and receiving from plaintiff a greater rate of interest than allowed by law, namely, 8 per cent interest on a note for $3,000.
The jury returned the following verdict:
(25) 1. Did the defendant knowingly take and receive from the plaintiff on the $3,000 note a greater rate of interest than 6 per cent per annum from 9 February, 1912? Answer: Yes.
2. If so, what amount of interest was paid on said note from 9 February to 30 May, 1912? Answer: $75.35.
3. What sum, if any, is the plaintiff entitled to recover? Answer: $150.70.
There was evidence that plaintiff was a member of the board of directors, one of the managing and loan committee of defendant bank; but he testified that, as such, he never passed on the loans of the bank, nor did he fix the rate of interest or help to do it. He also testified that he resigned about the time the loan in controversy was made, and that when he paid the unlawful interest he was not a member of the board of directors or the committee.
The following are the two instructions which defendant requested should be given to the jury: *Page 21 
1. "If the jury find from the evidence and by the greater weight thereof that at the time the note sued on in this action, to wit, on 9 November, 1911, and the time same was paid, to wit, on 30 May, 1912, the plaintiff was a stockholder and director in the Bank of Columbus, defendant in this action, and was at said time a member of the loan or finance committee, and as such passed on said note, and was at said time a member of the examining committee, the plaintiff would not be entitled to recover, even though they shall find that the plaintiff was charged and paid a greater rate of interest than 6 per cent."
2. "To entitle the plaintiff to recover in this action, the jury must find by the greater weight of the evidence, not only that the defendant charged and received more than 6 per cent interest from the plaintiff, but at the time same was charged and received the defendant knew it was usury, and there was in the mind of the lender a wrongful intent and purpose to take more than the lawful rate for the use of his money."
The first instruction was refused, and defendant excepted; the second was refused except as given in the charge, and defendant again excepted. Judgment for plaintiff, and defendant appealed.
After stating the case: The defendant loaned to the plaintiff the sum of $3,000, and charged, reserved, and received from him, as interest thereon, a sum in excess of the legal rate. The character of the transaction is not involved in any doubt. Interest is the premium allowed by law for the use of money, while usury is the taking of more for its use than the law allows. It is an illegal profit. 4 Blk. Com., 156; Yarboroughv. Hughes, 139 N.C. 200. If the lender knowingly takes, receives, reserves, or charges a greater rate than 6 per cent per annum, he forfeits the interest, and if the unlawful interest has been paid to him, he is liable to a penalty of twice the amount of interest so received. Revisal, sec. 1951.
The second prayer for instruction is directed to the intent with which the interest was paid. Where there is negotiation for a loan of money, and the borrower agrees to return the amount advanced at all events, it is a contract of lending, and however the transaction may be shaped or disguised, if a profit or return beyond the legal rate of interest is intended to be made out of the necessities or improvidence of the borrower, or otherwise, the contract is usurious. The corrupt intent mentioned in the books consists in the charging or receiving the excessive interest with the knowledge that it is prohibited by law, and the purpose to violate it. Our statute makes it usury if the interest is knowingly *Page 22 
charged or received at the unlawful rate. When the illegal purpose stands clearly revealed on the face of the instrument, as in this case, no further inquiry into the intent is required. Miller v. Insurance Co., 118 N.C. 612. The contract itself establishes the corrupt intent, as it is susceptible of no other meaning. These principles were settled in the recent case of Riley v. Sears, 154 N.C. 509.
This transaction cannot be explained upon any other theory than that the defendant knew the interest it exacted to be unlawful, and this makes it usury. Doster v. English, 152 N.C. 339. The court charged the jury that knowledge of the illegal character of the interest (27) received by the defendant was essential to its liability, when it gave this instruction: "If you find by the greater weight of the evidence that between 9 February, 1912, and 30 May, 1912, the plaintiff paid to the defendant bank a greater rate of interest than 6 per cent, and at the time the bank knowingly charged and received a greater rate than 6 per cent, then it is your duty to answer the first issue `Yes.' If you do not so find by the greater weight of the evidence, you would answer it `No.'"
The second question is, Did the fact that plaintiff was a member of the board of directors, and the managing and loan committee, purge the transaction of its usurious taint? The language of our statute (Revisal, sec. 1951) is positive and peremptory, and it was said (by Justice Hoke) inRiley v. Sears, supra, that the courts have enforced it strictly, and with insistence and alertness. It may be added by us now, that it is the declared policy of the State, which for many years has stood with the approval of the popular will, that usury shall not be exacted of the borrower, and "whenever, directly or indirectly, unlawful interest has been taken or charged, the provisions of the statute must be applied." Riley v.Sears, supra, and numerous cases therein cited. The only test is the taking of the excessive interest knowingly, and it can make no difference who is the borrower.
There is no exception in the statute of any person or class of persons. A bank is not privileged by the law to exact a larger rate of interest from its stockholders or officers than from those who are not.
This Court has uniformly held that a stockholder who has paid usurious interest to the corporation, of which he is a member, can recover the penalty, "notwithstanding that he is in pari delicto in the transaction. The statute (Code, sec. 3836; Revisal, 1951) expressly provides that a party who has so paid usurious interest (and is in pari delicto) may recover double the amount he has paid." Hollowell v. B. and L. Assn.,120 N.C. 286. The same was held in Rowland v. B. and L. Assn., 115 N.C. 825, where Justice Burwell says: "Thus, it *Page 23 
appears that what it takes from one of its stockholders, under the pretense that it is lending at 6 per cent, it gives to another with a (28) lavish hand. It is both a taker and a giver of usury."
The doctrine is familiar that where each is equally in fault (in paridelicto) the law favors him who is defending, or, as otherwise expressed, when the fault is mutual and of equal degree, the law will leave the case as it finds it. But the principle does not apply here. It is not, in law, a case of equal fault. Lord Ellenborough once said that where there is oppression on the one side and submission on the other, it never can be predicated as par delictum, for one holds the rod and the other bows to it. Broom's Legal Maxims (6 Am. Ed.), 695; Smith v. Cuff, 6 M. and S., 160. And in Atkinson v. Denby, 7 H. N. (Exch.), 993, approving Smith v. Cuff,supra, and Smith v. Bromley, infra, Chief Justice Cockburn said that where one of the parties is in a position to dictate and the other has no other alternative but to submit, it is virtually a state of coercion, and while the parties may be in delicto, it is no par delictum — they are not equally in fault, one being in a position of dependence on the other and having to submit to his terms or suffer if he does not, and that it would be mischievous if it were held that he could not recover the money paid under such circumstances.
Lord Mansfield, in the Court of King's Bench, while deciding the case ofLowry v. Bourdieu (2 Douglas, 469), reported in 99 Eng. Reports (Full Reprint, at pp. 209, 301), said, "he desired it might not be understood that the Court held that, in all cases where money has been paid on an illegal consideration, it cannot be recovered back. That in cases of oppression, when paid, for instance, to a creditor to induce him to sign a bankrupt's certificate, or upon a usurious contract, it may be recovered, for in such cases the parties are not in pari delicto."
The commentator on Jones v. Barclay, infra (99 Eng. Reports, Full Reprint, at p. 443, note F 7), says: "The inference to be drawn from the various decisions that have taken place on this subject, stated her and in the notes to Lowry v. Bourdieu, supra, 468, appear to be that, the general principle remaining, that in pari delicto potior est conditiopossidentis, the two following exceptions to its application (29) are also established: (1) That where the illegality exists in the contract itself, and that contract is not executed, there is a locuspenitentiae, the delictum is incomplete, and the contract may be rescinded by either party. (2) Where the law that creates the illegality in the transaction was designed for the coercion of one party and the protection of the other, or where the one party is the principal offender, and the other only criminal from a constrained acquiescence in such illegal conduct, in these cases there is no parity of delictum at all between the *Page 24 
parties, and the party so protected by law, or so acting under compulsion, may at any time resort to the law for his remedy, though the illegal transaction be completed."
In another case (Smith v. Bromley, reported only in a note to Jones v.Barclay, 2 Douglas, 684, but in full from notes of Justice Buller), LordMansfield also said on this subject: "If the act is, in itself, immoral, or a violation of the general laws of public policy, there the party paying shall not have this action; for where both parties are equally criminal against such general laws, the rule is potior est conditio defendentis. But there are other laws which are calculated for the protection of the subject against oppression, extortion, deceit, etc. If such laws are violated and the defendant takes advantage of the plaintiff's condition or situation, there the plaintiff shall recover (citing cases in note); and it is astonishing that the reports do not distinguish between the violation of the one sort and the other." He then applies this principle, and says that the man who from mere necessity pays more than the other can in justice demand, and who is called in some books the slave of the lender, has the right to recover back what he has thus paid to his creditor, who has no right to retain it in violation of the law, and that the maxim, Volunti non fit injuria, does not apply. "It is absurd to say that one willingly transgresses a law made for his own benefit." In order to prevent this oppression and advantage taken of the debtor's necessity, as described by Lord Mansfield, our law makes it penal for the lender to take more than it allows. And he concludes thus: "Upon the whole, I am persuaded that it is necessary, for the better support (30) and maintenance of the law, to allow this action; for no man will venture to take, if he knows he is liable to refund."
The law upon which the judges were commenting in the last two cases was not as stringent and inflexible in its terms as our statute (Revisal, sec. 1951). What right have we to restrict the scope of the statute by construction, when its terms are perfectly clear and explicit, being broad and comprehensive enough to embrace every borrower who pays usurious interest and every lender who exacts or receives it? Every man who applies for a loan, in a very genuine sense, counsels that it be made. It would be strange if he should advise anything else. His own interest and present needs would dictate just such a course. Every borrower consents to the loan that is made to him, and often it is urged with extreme importunity. But the greater his necessity and extremity, the less excusable is the act of the lender in exacting usury. If the contention of defendant is upheld, the banks would be practically exempt from the forfeitures and penalties of the law, when they lend upon illegal interest to their officers and agents. Suppose the usurer lends *Page 25 
to his agent, who has charge of his business, at the latter's request, shall he be allowed to keep the usury which he had no right to take? Our law intervenes and declares that not only the excess above the lawful rate may be recovered by the debtor, but "twice the amount paid," and, as we have said, without regard to the class or condition of the borrowers. They are all served alike. The only inquiry is, Was the money obtained extortionately? and if this be so, it has been uniformly decided that an action by the borrower will lie and the money recovered back.
In Smith v. Cuff, and other cases cited above, and many other cases that might be added to the list, the debtor had contracted with one of his creditors to give him a secret advantage over his other creditors in a general composition, and having paid the amount bargained for to the preferred creditor, it was held that he could recover it back, although he had made the bargain secretly, covinously, and for the purpose of defrauding the other creditors, who were ignorant of it, and for his own gain and advantage. The debtor recovers the money (31) unlawfully paid, though the creditor, who combined with him to cheat his associates, could not recover on his bargain. Wittkowskyv. Baruch, 127 N.C. 313. That case is no stronger than this, for here there is no fraud, and the statute gives the action for the usury besides, and it would not only be contrary to the uniform current of decisions noted above, but also against the declared policy of the State, to hold that plaintiff cannot recover.
The defendant loaned this money with its eyes open, so to speak. There is competent evidence that it was its custom to lend it at the higher rate. It cannot shift the blame to the plaintiff because he was its director, when it knew the law, and was fully aware of its violation; nor can its stockholders safely or justly rely on any such excuse. The money, which belongs to the plaintiff, because the law says so, was received by it, placed in its vaults, and is there now, as far as appears. Neither the bank nor its board of directors, nor its body of stockholders, which has supreme control of its affairs, has ever offered to return the excess of interest, though they have all had full notice of its payment by the bringing of this suit, and before it was brought. If they did not authorize the same originally, that is, approve what had been done, they have subsequently ratified it, with knowledge of the facts, by not returning even the excess, but retaining it themselves, and this we know is equivalent to a prior authorization of it.
We doubt if there is any sufficient evidence that plaintiff participated in the meeting in which this loan was made; but that, in our view of the case, is immaterial. There is no place here for recrimination. The law assumes that the debtor is in delicto, and protects him against his *Page 26 
own wrong, because of the inequality of the parties. And for this reason it is said that, in equity, "relief is granted against usurious contracts, whether executory or executed, since from considerations of public policy the two parties are not considered as standing on equal terms or in pari delicto." Webb on Usury, sec. 342; 2 Pomeroy Eq. Jur., sec. 937; Peacock v. Terry, 9 Ga. 137. His plea, therefore, is (32) not rejected because of his conduct in "advising" the loan to be made. "A contract by the borrower of money at an usurious rate of interest by which he agrees not to plead usury in defense to it does not estop him from doing so. Such a contract would, if sustained, furnish a ready mode of evading the usury laws." Webb on Usury, sec. 440. Whether this be a sound public policy or not, we are forbidden to inquire. We must abide by the written law. Ita lex scripta est.
We have nothing to do with the morality of the transaction nor the abstract merit of plaintiff's claim. We are judges of the law and not censors of his morals; but we say that it comes with poor grace from the defendant, who has openly violated the law, to blame the plaintiff for his part in the transaction. It would be inconsistent for the law to listen to such appeals, and condemn the plaintiff, when it has justified, if not encouraged, what he has done.
In conclusion, let us say that the usury laws are an exception to the rule, in pari delicto, and in a case precisely like this one in its essential features, the Court has so held. In Bank v. Slemmons,34 Ohio St. 142 (32 Am. Rep., 364), the Court said: "Recurring in this connection to the defense, it is clear that Thomas, the principal in the notes, was no more estopped from setting up the illegality (usury) by reason of his position as director, than if he had not been officially connected with the bank." Webb on Usury, sec. 518. The Court also held it to be clear, as matter of law, that none of the notes could bear interest, for the reason that their interest-bearing power was destroyed by the illegal agreement, and, therefore, payments made generally could only apply to the principal, and this by the very terms of the statute, the policy of which no court will investigate. "It is the duty of the court to ascertain and declare the law, and not to indulge in speculations as to its policy or propriety, for such questions must be determined by those who make the law. The statutes upon the subject of usury have been long regarded as purely remedial and subject to the modification and control of the legislative department, even as applied to past transactions." (33) Webb on Usury, sec. 12. And in Ferguson v. Sulphen, 8 Ill. 547, it was said of this question: "The law against usury is founded in principles of public policy, principles that have been for ages recognized, and almost universally adopted. Without inquiring *Page 27 
into the policy or justice of the statutes for the prevention of the usury, it is the imperative duty of the judicial tribunals faithfully to execute them. If there is any injustice or impolicy in these enactments, the fault rests with the Legislature and it must provide the proper corrective, and not the courts. Whenever the injured party invokes the aid of the courts, and presents a case clearly within the statute, there should not be the least hesitation in applying the appropriate remedy. The only effective mode of discouraging and preventing the practice of usury is by a rigid enforcement of the provisions of the statute. If a case comes within the mischief of the statute, it should be held to be within the remedy. And this seems to be the principle on which these statutes have everywhere been construed and administered. The real inquiry in every case is, whether there has been a borrowing and lending at a greater rate of interest than the law allows; and this becomes purely a question of fact, to be determined from all the circumstances of the particular case. The defense of usury is entitled to the same respect and consideration as other defenses authorized to be made in the courts, and it is the duty of the court to regard it the same as other defenses."
In defense of the law, if it needs any from us, Chancellor Kent, speaking of Jeremy Bentham's dictum, that he should not wish to see the "spirit of project in any degree repressed," and commending the words of Lord Redesdale, that "the statute of usury was founded on great principles of public policy," and further quoting from him, said: "It (the statute) was intended to protect distressed men, by facilitating the means of procuring money on reasonable terms, and by refusing to men who sit idle as high a rate of interest, without hazard, as those can procure who employ money in hazardous undertakings of trade and manufacture. I trust that theoretic reformers have not yet attained, on this subject, any decided victory over public opinion. The statute of usury is constantly interposing its warning voice between the creditor and the debtor, even in their most secret and dangerous (34) negotiations, and teaches a lesson of moderation to the one, and offers its protecting arm to the other. I am not willing to withdraw such a sentinel. I have been called to witness, in the course of my official life, too many victims to the weakness and to the inflamed passions of men," and he expressed the wish that "the first experiments of Bentham's projects may not be made within these walls." Dunham v.Gould, 16 Johns. (N. Y.), 367.
The plaintiff, at the time he paid the interest, complained to the cashier that it was excessive, and was told that it was the usual rate. The bank insisted on the usury to the last, and even to this time. If the borrower could not waive his right to take advantage of the usury *Page 28 
by a prior express agreement to do so, which we have seen he cannot do, why should any kind of previous consent affect his right when it was given?
There are four constituent elements in a usurious contract:
1. A loan or forbearance of money, either express or implied.
2. An understanding between the parties that the principal shall be or may be returned.
3. That for such loan or forbearance a greater profit than is authorized by law shall be paid or agreed to be paid.
4. That the contract is entered into with an intention to violate the law.
The fourth element may be implied if all the others are expressed upon the face of the contract, or are established by a sufficiency of evidence. Webb on Usury, sec. 18. All of them have been shown in this case, plainly and clearly, and we conclude that there is no reason why the plaintiff is not entitled to the benefit of the statute, without regard to the moral guilt, or his conduct in asking for it, whether it be good or bad. That the law favors the plea is sufficient; and while it does not become the usurer to question either the wisdom, policy, or justice of the law, it may be said that he is not expected to have a very good opinion of it. It is for this reason that the penalty is given to restrain his cupidity and to punish his defiance of it, and also to deter him from a repetition of the offense. There is no exception in the statute (35) of those who are induced to take usury, even against their will. It is the bare taking of it that is condemned by the law and penalized. No amount of persuasion, or even importunity, by the borrower, will justify the forbidden act of the usurer. He is subjected to the penalty for what he does, and cannot call to his aid the conduct of his debtor for his acquittal. The rule may appear to be harsh in some instances, but it must operate uniformly in order to execute the legislative will, so plainly declared.
Appellant suggests that plaintiff, as one of its officers, was a trustee, and therefore, that advising it to take usury was a breach of trust, for which he is liable in damages to the stockholders. We doubt the correctness of the abstract proposition thus stated, but it does not apply to this case. He denies squarely that he advised it, and the cashier's testimony is not inconsistent with his. The cashier does not say that he advised the taking of 8 per cent in this case, but only that he generally advised it, but they did not always follow his advice. The bank knew that it was charging usury. It was not an incompetent nor an imbecile, and did not have to be told by him what was the legal rate. It will hardly be urged that it did not know the legal rate. *Page 29 
The fiduciary relation, if it existed, counts for nothing, if the cestuique trust — the bank and its stockholders — knew of and consented to the loan, as was done in this case. It will not be asserted that the latter could recover any damages under such circumstances. Townsend v.Williams, 117 N.C. 336, does not apply. The director here was not dealing with a third party, as in that case, but the bank was dealing with him as its borrower. "Note the diversity." Besides, even if plaintiff has looted the bank, the latter is the beneficiary of the loot, which it now holds and refuses to return. After plaintiff had resigned and he and the bank were at arm's length, so to speak, he having divested himself of all fiduciary relation to it, he complained to the cashier of the excessive interest, when he paid the money, simply as a borrower of the bank, and the bank, by its cashier, even then insisted upon the usury. Notice to the cashier was notice to the bank and its stockholders, for he was vested with plenary authority, and he (36) took the excessive interest for the bank "with his eyes open" and after being warned not to exact it. The bank has since ratified what he did, if ratification was needed to bind it by his act.
Gund v. Ballard, 73 Neb. 547, has no application. It was a suit in equity for a settlement of the affairs of a corporation, and as plaintiff was asking equity, the court merely required him to do equity and take the legal interest, and the whole controversy was about that matter, except so far as it was mixed with the actual fraud of the plaintiff. But that is not this case at all. This is a suit at law, unmixed with any equity, to recover a statutory penalty, and we are compelled to obey the mandate of the statute, regardless of our personal views of its morality. There is no equitable principle involved, and this Court has so ruled in the cases we have cited, which have allowed officers to recover. If, however, the Gundcase were in point, we should follow our own decisions, which construe our own statutes, especially as they are sustained by decisions in other jurisdictions. If anything is settled by the books, it is that the maxim,in pari delicto, does not apply to usury cases. If a borrower's promise to waive usury, which itself induced the loan, is not binding, how can there be any waiver in the case?
The "blood-letting" statute may have been obscure, though we do not think it was, and the Court properly construed it, but it is a "far cry" from this statute to that one, for the Legislature has made its meaning perfectly clear, and there can be no reasonable doubt that the law denounces all loans upon usury indiscriminately and annexes the forfeiture and the penalty. It makes no distinction among borrowers — they are all under its care and protection. The phlebotomy case and this one are, therefore, wide apart in time and tenor, the only similitude being *Page 30 
that the sufferer is bled in both cases, but here the analogy ceases, and the bank cannot assume the role of the good physician, as its own act was not one of benevolence.
There is no danger of breaking a bank by insisting upon obedience to the plain mandate of the statute. Lending to its officers upon usury is no more dangerous to it than lending to other persons. If one (37) course will deplete its funds and empty its vaults, the other just as surely will do the same thing. No argument, therefore, can be drawn from this classification of borrowers which can militate against the strict execution of the legislative will, as unmistakably written in the statute, Revisal, sec. 1951, and as interpreted by this Court in numerous cases. The stockholders are not parties to this suit, they seek no relief, and the bank has set up no counterclaim, either for itself or in their behalf. If this were a matter of mere sentiment, and not the construction of a positive statute, we might question the propriety of plaintiff's course; but not being so, we must abide by the Legislature's declaration of its policy. The bank, though, is in no position to criticise the plaintiff's conduct, as it has broken the law and still holds his money, received in open violation of it.
In Thomas v. Fish, 9 Paige (N. Y.), 478, 482, a case much stronger for the defendant than is this, it was held that the actual fraud of the borrower in palming off a false security upon the lender will not defeat the plea of usury in an action by the latter to recover the debt, as the statute is peremptory in its terms and admits of no such exception. The statute, construed in that case, is like ours. The law encourages the plea to prevent the wrong or its repetition, and to enforce its policy, which is based upon the ancient proverb that "the borrower is servant to the lender," and it seeks, therefore, to protect the latter against injustice and oppression.
The Court in Miles v. Kelly, 25 S.W. 724, said that, under the statute, the debtor cannot waive or contract away his right to the defense of usury, nor can he be estopped to insist upon it. To the same effect is Bank v. Smyth, 9 Tex. Civ. App. 540, where the debtor attempted to do so by express contract. The Court held that it was directly opposed to the policy of the law to allow it and thereby defeat its beneficent purpose. When rightly considered, the authorities are all one way. At this term we have held, in Cooke v. Cooke, post, 272, construing the ten years divorce provision of the statute, that as no exception is made against the right of either party to bring the suit, the Court could (38) not hold that it can lie only in favor of the party injured. Justice Hoke (the Chief Justice and Justice Brown concurring) says: "There is no such exception, and the courts are not at liberty *Page 31 
to add to the statute what the Legislature has not seen fit to provide." And again: "As no exception is made in favor of the injured party, nor to exclude the time covered by the divorce a mensa, we must administer the law as we find it, and if it proves to be unwise in policy or undesirable in results, it must be changed by the legislative department, which has exclusive cognizance of the subject." This is really an apt and close analogy, and, in principle, there is absolutely no difference or distinction between the two cases. The one inevitably rules the other. There was a dissenting opinion in the case, but upon the ground, solely, that the statute had expressly provided that the suit should be brought by the injured party only.
In ascertaining the legislative will, we are warned against what is known as the predestined interpretation of statutes, which takes place when, laboring under a strong bias of mind, induced even by a sense of justice, we unconsciously make the text subservient to our preconceived views or desires, which accord, it is true, with our individual notion of what is abstractly right. This, we are told, is making the law, and not even interpreting or construing it, which itself is not permissible, when it is plainly written and carries but one meaning. There is then no room for reasoning or construction. We merely declare it to be what in reality it is.
After a careful review of the record, we conclude that the ruling of the court was correct.
No error.