Hillsborough,  
Jan. 5, 1932.

AUGUSTE U. BURQUE, & a. v. CHARLES M. BRODEUR,

Individually and as HOME FINANCE OF NASHUA.

*Lucier & Dowd* (*Mr. Lucier* orally), for the plaintiffs.

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Jonathan Piper* orally), for the defendant.

BRANCH, J. No argument having been presented by the defendant in support of his exception to the overruling of his demurrer it is assumed that all objections to the form of proceeding and to the sufficiency of the pleadings have been waived and we proceed at once to a consideration of the merits of the case.

At the time of the transactions here involved the defendant was licensed to do business under the terms of the small loans act (P. L., *c.* 269). The essential provisions of this act are (1) that only licensees are permitted to charge more than 6% interest upon loans of $300 or less (*s.* 1); (2) that upon loans of $300 or less licensees are permitted to charge interest at a rate not to exceed 3% per month (*s.* 15); (3) that if interest or charges in excess of those permitted by the act are exacted the "contract of loan" shall be void (*ss.* 21, 23); (4) that no person shall owe any licensee at any time more than $300 for principal (*s.* 24); (5) that any person violating the prohibitions of the act shall be subject to fine and imprisonment (*s.* 28). The repeal of the general usury statute (P. S., *c.* 203, *ss.* 2, 3) in 1921 (Laws of 1921, *c.* 121) did not affect these provisions which were expressly "continued in full force and effect." *Ib. s.* 2.

From the findings of the master the following facts appear. On October 5, 1927, one John B. Dionne obtained a loan from the defendant in the sum of $300 on his note with a good indorser. This note was payable at the rate of $25 per month with interest at 3% per month payable monthly. Upon December 16, 1927, Dionne ap-

plied for an additional loan of $250 and the defendant then explained to him that under the law he could not have loans outstanding to any one person aggregating more than $300 at one time. The defendant, however, was willing to continue to make loans to Dionne provided he could obtain the notes of responsible parties and provided the defendant could invent a scheme to evade the statutory limit of indebtedness. The details of the scheme which he finally devised are exemplified by the manner in which the note of the plaintiff Soucy was secured.

On March 19, 1928, Dionne desired to borrow $250 in addition to his then outstanding indebtedness and the defendant accordingly made out a note for that amount payable to Home Finance of Nashua on demand with interest at the rate of 3% per month payable monthly, and sent Dionne out to obtain a responsible signer. Dionne took the note to Soucy and represented to him that he (Dionne) desired to borrow $250 from the defendant but that he must have an indorser on his note. Soucy, purely as an accommodation to Dionne and to enable him to obtain a loan of $250 from the defendant, signed his name at the bottom of the note understanding that Dionne was also to sign as principal and that he (Soucy) was merely lending his credit to Dionne to enable Dionne to obtain a loan of $250 from the defendant. The defendant then loaned Dionne $250 on the strength of Soucy's note and had Dionne sign and deliver to Soucy a note for the same amount. The "defendant then entered this transaction on his books as a loan of $250.00 by Home Finance of Nashua to Soucy and called it that Soucy had in turn loaned $250.00 to Dionne on Dionne's note to Soucy."

April 2, 1928, the note of the plaintiff Johnson was obtained in the same way, and upon June 30, 1928, the note of the plaintiff Burque was signed under similar circumstances. At the times when the three notes in question were executed the amount of Dionne's indebtedness to the plaintiff was greatly in excess of $300. The conclusion of the master was as follows: "The only person who received any money on these notes was Dionne and I find that every one of these transactions was a loan to Dionne and to no one else, and that the form of the transactions invented by the defendant was solely for the purpose of evading Public Laws chap. 269, sec. 24." There is no merit in the argument of the defendant that the evidence does not support the finding of the master that all of the transactions evidenced by the notes in question were loans to Dionne. Dionne testified repeatedly that he borrowed the money and it was conceded that he paid the

interest on all the notes in question until January, 1929. The master finds in effect that the defendant accepted Dionne as his debtor and took the notes of the plaintiffs as collateral security for loans to him. The evidence fully justifies this finding.

At the time these loans were made Dionne owed the defendant much more than $300 and from this fact we think it is a necessary conclusion that his agreements to repay them were void as violations of the statute. In no other way can practical effect be given to the clear prohibition of section 24 which says that "no person shall owe any licensee at any time more than three hundred dollars for principal." (P. L., c. 269, s. 24.) Language of clearer import could hardly have been used. Since no person is permitted to owe a licensee more than $300 as principal, any attempt to create a debt in excess of that amount must necessarily be void. This conclusion seems so inevitable that any reference to the rule that no right can be founded upon a transaction which involves a violation of law (*Albertson* v. *Shenton*, 78 N. H. 216, 217; *Morin* v. *Company*, *ante* 233) may well be regarded as superfluous.

The defendant, however, argues that this interpretation of the act should not be adopted because sections 21 and 23 specify the kind of breaches of the statute which shall make the contract of loan unenforceable, and if it had been intended that other breaches should invalidate loans the legislature would have said so.

Section 21 provides that if interest or other charges in excess of those permitted by the act shall be contracted for or received, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges. Section 23 extends these provisions to loans contracted outside the state. The argument of the defendant continues as follows: "The legislative purpose is clear. Any breach of any provision of sections 21 and 23 invalidate [s] the contract of loan. Any breach of any other provision of the statute merely subjects the person committing the breach to the penalties therein provided. Any other construction would render sections 21 and 23 meaningless and the legislature is not to be presumed to have interpolated two altogether meaningless sections into this statute."

The broad answer to this argument is to be found in the fact that sections 21 and 23 deal with a subject entirely distinct from that covered by section 24. The two sections first mentioned determine the effect of an attempt to exact excessive charges upon loans legal in amount, while the last section limits the amount which may be loaned.

There is no apparent reason why the clear provisions of the sections relating to interest and other charges should be construed to limit the effect of the equally clear provisions of the third section in regard to amount.

A more specific answer to the defendant's argument, however, is to be found in the fact that when the small loans act was passed in 1917 the general usury statute then in effect (P. S., c. 203, ss. 2, 3) provided that a loan agreement calling for the payment of interest in excess of 6% should be invalid only as to the excess of interest. The principal of the loan and interest at the legal rate were still collectable. Sections 21 and 23 of the act under consideration clearly had the effect of removing small loans from the operation of these provisions of the general usury law. An appreciation of this factor in the situation further demonstrates the unsoundness of the argument that sections 21 and 23 are rendered meaningless by the interpretation which we have placed upon section 24.

The defendant further argues that even though the loans to Dionne be unenforceable the notes of the plaintiffs are still valid since in each instance "the obligation was absolute and in no way contingent on and cannot be affected by any other agreement, verbal or written, that might have existed between Dionne and their payee." It is also asserted that the contracts of the plaintiffs with Mr. Brodeur are stated in the various notes which they signed and "are not to be varied by parol evidence."

These arguments may be briefly answered. A promissory note is a unilateral instrument which states a single obligation of the signer or signers. It is not a document which purports to integrate or embody in full all the agreements of the parties at the time it was made. Consequently the parol evidence rule does not preclude proof of other terms of the agreement not stated in the note. 5 Wig. Ev., ss. 2430, 2443; 3 R. C. L. Tit., Bills and Notes, s. 232; *Bunker* v. *Company*, 84 N. H. 84, 87. The absolute character of a maker's obligation to pay the face of his note to a holder in due course arises from the law merchant and not from the parol evidence rule. 3 R. C. L. Tit., Bills and Notes, ss. 8, 208. The form of negotiable paper is only *prima facie* evidence of the relationship of the parties. *Richardson* v. *Huggins*, 23 N. H. 106, 122; *Maynard* v. *Fellows*, 43 N. H. 255, 258. In controversies between the parties themselves their true relationship may always be shown. *Grafton Bank* v. *Kent*, 4 N. H. 221; *Whitehouse* v. *Hanson*, 42 N. H. 9, 18; *Maynard* v. *Fellows, supra; Howard* v. *Fletcher*, 59 N. H. 151; *Conway &c. Bank* v. *Dow*, 69 N. H.

228. Hence if a note absolute on its face was in fact executed and delivered as collateral security for the debt of another this fact, as between the parties, may be proved by parol evidence. *M'Questen* v. *Noyes,* 6 N. H. 19 was a case of this description.

The assertion of the defendant that the plaintiffs "did not have and did not claim to have any other contract, oral or written, with the defendant" aside from that embodied in their notes finds no support in the findings of the master or in the evidence. It is found that all the plaintiffs "signed the notes simply and solely as an accommodation to Dionne to enable him to obtain loans from the defendant," and that "every one of these transactions was a loan to Dionne" on the security of the plaintiffs' notes. Since the minds of the parties met in regard to the nature of the transaction it is immaterial that there was no direct communication between them. Having acted upon a common understanding through Dionne as an intermediary, all the requirements of a valid contract were fulfilled. *McConnell* v. *Lamontagne,* 82 N. H. 423, 425-426.

It is a general principle of the law of suretyship that a discharge of the principal because of matters inherent in the transaction operates to discharge the surety also. 21 R. C. L. Tit., Principal and Surety, s. 107. "When contracts are joint, any kind of discharge of one promiser on the merits of the contract is in law a discharge of all promisers." *Townsend* v. *Riddle,* 2 N. H. 448, 449. A discharge of one promisor on the ground of "illegality in the consideration" is a discharge on the merits of the contract. *Ib.* 450. Since the illegality inherent in the transactions between Dionne and the defendant operated to discharge Dionne as the principal debtor it follows in accordance with the foregoing principle that the plaintiffs were also discharged as sureties. Strictly speaking, the ruling of the master that the notes in question "are all null and void under P. L., c. 269, s. 24" cannot be sustained. The non-liability of the plaintiffs does not arise from any infirmity in the notes themselves but from the discharge of Dionne as the principal debtor by operation of law. Nevertheless upon the facts found by the master the plaintiffs were entitled to a decree and the order therefore is

*Exceptions overruled.*

All concurred.