This controversy arises under the Small Loan Act, chapter 62,P.L. 1932 p. 94, and not under R.S. 17:10 referred to in the brief filed on behalf of complainant, as all of the transactions here involved occurred prior to the effective date of the Revision.
By this bill the complainant seeks a forfeiture of certain notes and other obligations in writing executed by the complainant in favor of the defendants (one or both), the surrender and cancellation of certain written instruments evidencing such obligations, and the recovery of a penalty from the defendants because of their alleged violation of certain provisions of the Small Loan Act.
The controversy arises out of the following circumstances:
The complainant is a dealer in second-hand automobiles and had, for about ten years previous to the filing of the bill of complaint, been engaged in the purchase and sale of automobiles in Essex County, New Jersey, carrying on his business on several different parking lots in Newark and Irvington. The defendant Motor Credit Company, Inc., is a New Jersey corporation licensed to operate under the Small Loan Act and is a subsidiary of the co-defendant General Acceptance Corporation which owns all of its stock. The two corporations have common or interlocking officers and directors.
In the course of its business the defendant Motor Credit Company, Inc., loaned money on the security of automobiles, *Page 534 
and from time to time took into its possession cars pledged for such loans. It found a ready outlet for many of these cars through the complainant who, in order to finance his purchases from this defendant, obtained loans from it from time to time, pledging the cars so purchased as security for such loans.
In 1935 these business transactions materially increased, and in order to circumvent the prohibition of the statute which limited the amount which any one individual could owe to a small loan company at any one time to $300, the complainant and the defendant Motor Credit Company, Inc., entered into an arrangement whereby the complainant obtained the necessary loans in the names of nominees, relatives, friends, employees or fictitious persons. In some instances the papers evidencing such loans were signed by the various nominees, but in many instances the complainant himself signed the papers using fictitious names or forging the names of others. Names for this purpose were sometimes selected at random from telephone directories, from tombstones or taken from the thin air. The result was that in the spring of 1937, when an accounting was had between the parties, the complainant owed the defendant Motor Credit Company, Inc., on account of such loans, a sum in excess of $28,000. The evidence indicates that in the two years preceding the filing of this bill the loans from Motor Credit Company to complainant were in excess of $75,000, and he claims to have paid to the defendants on account of these various loans more than $50,000. A schedule of the loans during this period, made up from the defendants' records, was offered in evidence and marked Exhibit C-18. From this and other evidence it appears that there were 472 dummy loans made by the defendant Motor Credit Company, Inc., to complainant during 1935, 1936 and 1937. Many of these loans were obtained by either the complainant or his nominees signing the papers in blank and leaving them with the Motor Credit Company, Inc., to be filled in at a later date as occasion should require. Bills of sale which were supposed to accompany these transactions and to be filed in the Motor Vehicle Department were not, in many instances, furnished, *Page 535 
and generally speaking, there was no attempt at actual compliance with the requirements of the statute. In May, 1937, the defendants, apparently anticipating some trouble over these excessive loans, had an accounting with the complainant at which it was determined that there was a balance of principal of $28,918.95 due Motor Credit Company, Inc. These claims were then all assigned by Motor Credit Company, Inc., to the General Acceptance Corporation, the parent company, and the complainant gave the latter company his promissory note for the amount of such balance and a blanket mortgage covering all the automobiles on his various parking lots, with the understanding that thereafter he was to pay six per cent. interest on the amount of the balance instead of thirty per cent. as theretofore. In computing the balance due the defendant Motor Credit Company, Inc., no credit was given to the complainant for excess interest theretofore paid on the various loans. Whatever vice was inherent in the original loan transactions followed and attached to all substituted obligations, securities or agreements. Boyd v.Engelbrecht, 36 N.J. Eq. 612; Kobrin v. Hull, 96 N.J. Eq. 41;Berk v. Isquith Productions, Inc., 98 N.J. Eq. 608. The complainant also executed an agreement guaranteeing the General Acceptance Corporation against any loss on foreclosure of the chattel mortgage and the sale of the automobiles. After the execution of these papers the complainant sold many of the cars covered by the chattel mortgage and applied the proceeds to the payment of the principal on the mortgage, thus reducing the principal thereof to approximately $15,000 or $16,000. In October, 1937, the General Acceptance Corporation instituted replevin proceedings against the complainant and took possession of all unsold automobiles on complainant's lots. Thereupon complainant filed this bill to restrain the prosecution of the replevin suit and for other relief. The purpose of this suit is admittedly to recover as a penalty moneys paid to the defendants by the complainant on account of the various loans to him and his nominees in violation of the Small Loan Act, and the forfeiture of the balance due on these loans. *Page 536 
The bill charges numerous violations of the provisions of the Small Loan Act, chief of which, however, are the violations of sections 13 and 15 of chapter 62, P.L. 1932. Section 13 of that act authorizes a loan company licensed thereunder to make loans in sums not exceeding $300 to any one person, and to charge interest thereon at a rate not exceeding two and one-half per cent. per calendar month, or thirty per cent. per annum. That section also provides that "if any interest, consideration or charges in excess of those permitted by this act are charged, contracted for or received, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges whatsoever, and the borrower shall be entitled to recover from the lender any or all sums paid or returned to the lender by the borrower on account of or in connection with such loan."
Section 14 prohibits a licensee from taking any note or other instrument in which blanks are left to be filled in after execution.
Section 15 prohibits a licensee from permitting "any person as borrower or as endorser, guarantor or surety for any borrower, * * * or otherwise to owe directly or contingently or both to the licensee at any time the sum of more than $300 for principal."
Section 18 prohibits the charging or receiving of interest in excess of six per cent. (the usual legal rate) on loans in excess of $300, and provides that any such loan on which greater interest is charged or received shall be unenforceable.
The bill prays for the surrender and cancellation of complainant's note, the chattel mortgage and the guarantee agreement, a decree enjoining the defendants from collecting any moneys of complainant on either the chattel mortgage or the guarantee agreement, and from prosecuting the replevin action in the Essex County Circuit Court; from selling, encumbering or disposing of the automobiles taken in replevin; a discovery of the moneys lent to, contracts and engagements entered into between complainant and defendant, and the interest charged; a decree for an accounting of the money and assets of the complainant paid or delivered to, or taken by, the defendants, and directing the defendants to *Page 537 
return to the complainant all moneys paid or property delivered to them contrary to the provisions of the Small Loan Act.
In support of complainant's prayer for surrender and cancellation of the chattel mortgage and note executed by him at the time of the accounting between the parties, he alleges that when he signed these papers they were in blank, that he did not know what he was signing and that his signatures were obtained by subterfuge. The facts are to the contrary. Ryan knew what he was doing at all times and the papers were not signed in blank. The evidence on this point is quite conclusive.
The defendants deny having violated any of the provisions of the Small Loan Act, allege that they had no knowledge of the fact that the various loans involved were made to the complainant in the names of nominees, dummies or fictitious persons, and assert that the transactions which form the basis of this complaint were the result of a conspiracy to defraud the defendants entered into by the complainant and one Devine who was the manager of the defendant's Newark office. Defendants insist that they are without fault in the premises and that all of the transactions involved, so far as they know, were strictly within the law. Defendants also plead the Statute of Limitations, section 21, 3Comp. Stat. p. 3170, and that complainant comes into court with unclean hands. The defendants also counter-claim on the guarantee agreement executed by the complainant for approximately $16,000, and ask that the complainant be decreed to account and that the issues in the replevin suit be disposed of in this court. In this latter request the complainant joins.
Notwithstanding defendants' denial of any knowledge of any violation of the provisions of the Small Loan Act, and its charges of conspiracy between complainant and its manager Devine, there is no doubt whatever in my mind but that the transactions here involved were all within the knowledge of both defendants, and that the practice resulting in them was instituted by one or more of the head officers of the defendant companies and approved by them. I came to this conclusion during the course of the final hearing, and have *Page 538 
no hesitancy in now holding that the excessive loans and charges made by the defendants and the other violations of the provisions of the Small Loan Act were with the full knowledge of the defendants, that they knowingly and willfully participated in these transactions, and conspired with the complainant to circumvent the statute. In this conclusion I am fortified by the verdict of a jury rendered in February last in a suit in the New Jersey Supreme Court entitled "General Acceptance Corporation, a body corporate, and Motor Credit Company, Inc., a body corporate, plaintiffs, against Continental Casualty Company, a body corporate, defendant," which was tried during January and February of this year at the Essex Circuit. The docket number of that case is 111829 and it is entered on page 186 of docket 72 in the office of the clerk of the New Jersey Supreme Court. The defendants' knowledge of the illegal transactions between complainant and its Newark office was in issue in that suit, and by the verdict of the jury that issue was decided adversely to the plaintiffs who are the defendants here. But whether or not the provisions of the statute here involved were willfully or intentionally violated by the defendants is, perhaps, immaterial in this controversy. Consolidated Plan of New Jersey v.Shanholtz, 7 N.J. Mis. R. 876; affirmed, 107 N.J. Law 517;Richmond v. Conservative Credit Systems, 10 N.J. Mis. R. 14
(reversed on other grounds, 110 N.J. Law 73); Cotton v.Commonwealth Loan Co. (Ind. App. Court), 184 N.E. Rep. 578;Colonial Plan v. Tartaglione (R.I. Sup. Court),147 Atl. Rep. 880. I have already held, in an opinion filed herein on July 12th, 1938, that a bill of discovery will not lie to enforce a penalty or a forfeiture, and that it is against the general principles of equity to aid in the enforcement of penalties and forfeitures. And it is a rule of equity that "one who comes into a court of conscience to enforce a forfeiture must come with skirts free from blame in the transaction." Wilson v. Bird,28 N.J. Eq. 352.
There is no doubt but that the transactions here involved were in violation of sections 13, 14, 15, 18, 19, and perhaps other sections, of chapter 62, P.L. 1932. By section 19 violations of sections 1, 11, 12, 13, 14 and 18 are made misdemeanors; *Page 539 
and contracts, in the making or collection of which any act shall have been done which constitutes a misdemeanor, are void and unenforceable.
The complainant contends that the act is not penal, but remedial only, and that, therefore, the Statute of Limitations pleaded by the defendants is not applicable. In People v. CoeManufacturing Co., 112 N.J. Law 536, our Court of Errors and Appeals held that "penal laws, strictly speaking, are those imposing punishment for an offense against the state, and the test whether a law is penal is whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual." The title of the act (chapter 62, P.L. 1932) includes the words "prescribing the * * * penalties for the violation thereof." In this respect the title differs from that of the 1914 act (chapter 49, P.L. 1914 p. 75), which contains no reference to "penalties." In 21 R.C.L. 206, tit. "Penalties" ¶ 1, the text reads as follows:
"The words `penal' and `penalty' * * * strictly and primarily * * * denote punishment, whether corporal or pecuniary, imposed and enforced by the state for a crime or offense against its laws. But they are also commonly used as including an extraordinary liability to which the law subjects a wrongdoer in favor of the person wronged, not limited to the damages suffered."
In Black on Interpretation of Laws 469, the text reads:
"It has been held that usury laws, when they prescribe the forfeiture of all interest upon contracts affected by unlawful charges of interest, are penal laws and to be strictly construed."
But, as will be seen, also from that text, a statute may be both penal and remedial. And see Ordway v. Central NationalBank of Baltimore, 47 Md. 217; Bones v. Booth, 2 Black. W.1226; 96 Eng. Rep. 721.
In Morin v. Newberry, 65 Atl. Rep. 156, the Supreme Court of Errors of Connecticut held that:
"General Statute 1902, section 4134, providing penalties for loaning money on chattel mortgage notes in which the sum of money loaned is stated as greater than that actually loaned, or in which the interest rate charged is greater than *Page 540 
allowed by law, and making such mortgages and notes void, being distinctly penal, should receive strict construction."
The penalties in chapter 62, P.L. 1932, are similar to those specified in the Connecticut statute, and there are additional penalties — money paid — which may be recovered by the borrower. If the Connecticut statute is "strictly penal" the New Jersey statute is at least penal in part, even though remedial in part. And any statute which will support an indictment must be penal in character. State v. Guida, 119 N.J. Law 464. In my judgment the act is remedial as to the borrower and penal as to the lender. Cf. Ellis v. Beale, 18 Me. 337.
The Statute of Limitations (3 Comp. Stat. p. 3170 § 21) pleaded by the defendants in bar of complainant's cause of action reads as follows:
"That all actions or informations which shall be brought or exhibited for any forfeiture upon any penal statute made or to be made, whereby the said forfeiture is or shall be limited to the State of New Jersey only, shall be brought or exhibited within two years next after the offense committed or to be committed against such penal statute, and not after; and all actions or informations, which shall be brought or exhibited for any forfeiture upon any penal statute, made or to be made, the benefit and suit whereof is or shall be by the said statute limited or given to any person or persons who shall prosecute for the same, or to the State of New Jersey, and to any other who shall prosecute in that behalf, shall be brought or exhibited by any person or persons who may lawfully sue for the same as aforesaid, within one year next after the offense committed or to be committed against the said statute; and in default of such suit, then the same shall be brought or exhibited for the State of New Jersey, at any time within one year after the termination of the aforesaid year, and not after; and all actions or informations which shall be brought or exhibited for any forfeiture or cause upon any statute, made or to be made, the benefit and suit whereof is or shall be limited or given to the party aggrieved, shall be brought or exhibited within the space of two years, next after the offense committed or to be committed, or cause of action accrued, and not after; provided always, that where any action or information is or shall be limited by any statute to be brought or exhibited within a shorter time than is limited by this section, then the said action or information shall be brought or exhibited within such shorter time so limited by such statute."
In view of the provisions of that act I am inclined to the view that the statute is a bar to any right of action arising *Page 541 
out of any transaction which was completed prior to a date two years before this bill was filed, but I need rest no part of my decision in this cause on that statute or defense as will hereinafter appear.
It will be noted that excess loans in violation of section 15 do not, under the act, constitute misdemeanors and they are not expressly declared void; but, being prohibited by the statute, they are undoubtedly void and unenforceable. Brittin v.Freeman, 17 N.J. Law 191, 205; Brooks v. Cooper, 50 N.J. Eq. 761; Sagal v. Fylar, 89 Conn. 293; 93 Atl. Rep. 1027.
As section 18 of the statute prohibits a charge of more than six per cent. interest (the usual legal rate) on loans in excess of $300, it is clear that, as the Motor Credit Company, Inc., charged and collected interest at the rate of two and one-half per cent. per calendar month on such of the loans here involved as were paid, both sections 13 and 18 of the act were violated. Section 13 provides that if interest in excess of that allowed by the act is charged or received, the contract of loan shall be void, the licensee shall have no right to collect or receive any principal, or charges whatever, and the borrower shall be entitled to recover from the lender any or all sums paid or returned to the borrower on account of or in connection with such loan. In view of these and other provisions of the act, it follows, I think, that the defendants' counter-claim should be dismissed, and, unless the complainant is barred from relief by considerations to be hereinafter discussed, he is entitled to a decree enjoining the defendants from prosecuting any claim against him on any of the outstanding contracts, the chattel mortgage, the note which it was given to secure, or the guarantee agreement. Cotton v. Commonwealth Loan Co., supra; Easy TermLoan Co. v. Silberman, 100 N.J. Law 67; Independent Loan Co.
v. Tyson, 117 N.J. Law 259; Consolidated Plan of New Jersey v.Shanholtz, supra; Richmond v. Conservative Credit System,supra; Union Loan Association v. Woodie, 13 N.J. Mis. R. 214;177 Atl. Rep. 438; Trustees v. Stoll, 13 N.J. Mis. R. 490;179 Atl. Rep. 372; Westville and Hamden Loan Co. v. Pasqual
(Conn.), 145 Atl. Rep. *Page 542 758; Burque v. Brodeur (N.H.), 158 Atl. Rep. 127. Many of the New Jersey cases here cited arose under the 1914 act which was somewhat modified by the 1932 act. The purpose of the legislature in adopting the 1932 act seems to have been to modify the severity of the punishment for violations of the 1914 act, and some of the penalties prescribed by the 1914 act were altogether abolished. Under the 1914 act every violation of its provisions by the lender constituted a misdemeanor, and every contract resulting from such violations was not only void, but the borrower had a right to recover from the lender everything that he had paid on account thereof; and that action might be taken at any time either during the continuance of or after the termination of the contract. Under the 1932 act, however, it is only in certain instances mentioned in section 13 that the borrower has any right of recovery, although the right of the lender to enforce payment of his loans is defeated whenever the contract is tainted by illegality.
The real controversy in this suit is that touching the right of the complainant to recover from the defendants such sums as he has heretofore paid to them, or either of them, on account of the 472 illegal contracts of loan made by the parties.
During the course of the final hearing I suggested that the rule of law expressed in the well-known maxims, "In pari delictopotior est conditio defendentis, et possidentis," or "ex turpicausa non oritur actio," might bar both parties to this suit from any relief; that it appeared from the evidence that the parties were in pari delicto; and that in such circumstances it was the policy of the law to leave the parties in the position in which they had placed themselves.
It is a rule both of law and of equity that no one can found a cause of action on an illegal contract, or interpose its illegality as a defense to such action. Ellicott v.Chamberlain, 38 N.J. Eq. 604; Cone v. Russell Mason, 48 N.J. Eq. 208; Brooks v. Cooper, supra; Brindley v. Lawton, 53 N.J. Eq. 259; Prindiville v. Johnson Higgins, 93 N.J. Eq. 425;Slater v. Gittleman, 104 N.J. Eq. 172; Cameron v.International Alliance, c., 118 N.J. Eq. 11, 20; Cameron *Page 543 
v. International Alliance, c., 119 N.J. Eq. 577, 590; Collins
v. International Alliance, c., 119 N.J. Eq. 230, 239; Church
v. Muir, 33 N.J. Law 318; Price v. Polluck, 37 N.J. Law 44;Hope v. Linden Park Blood Horse Association, 58 N.J. Law 627;Wooden v. Shotwell, 24 N.J. Law 789, 792; Van Pelt v.Schauble, 68 N.J. Law 638; Woodson v. Hopkins, 85 Miss. 171;7 L.R.A. 645; Ex parte Dyster, 2 Rose 349, 359; Petrie v. Hannay,3 T.R. 418, 422; Montefiore v. Montefiore, 1 Black. W. 363;Fival v. Nichols, 2 C.B. 501; 135 Eng. Rep. 1042 (1846);Griswold v. Waddington, 16 Johnson's Rep. (N.Y.) 485;Holman v. Johnson, 1 Cowp. 343; 98 Eng. Rep. 1120; Broom'sLegal Maxims 473, 480; 1 Story Eq. Jur. (11th ed.) 310
¶ 298; 1 Pom. Eq. Jur. 746 ¶ 401, p. 750 ¶ 402; 2 Pom. Eq.Jur. (4th ed.) 1992 ¶ 940; 13 C.J. 492 tit. "Contracts"
¶ 440; 12 Am. Jur. 713 tit. "Contracts."
It is true that the defendants have not specifically invoked the rule of law expressed in these maxims, the objection having been raised by the court, as I believe was eminently proper (2Pom. Eq. Jur. 1995; Slater v. Gittleman, supra); but they have set up the defense that the complainant does not come into this court with clean hands, and plead his alleged fraud as evidence of that fact. The doctrine of clean hands, as I understand it, includes the doctrine expressed in the maxims above quoted.Barnes v. Starr, 64 Conn. 136; 28 Atl. Rep. 980, 984.
If the maxims "he who comes into equity must come with clean hands," or either of the maxims above quoted, has any application to this case, then the complainant is not entitled to any relief in this court either by way of surrender and cancellation of his written obligations, or by the recovery of the penalty imposed by section 13 of the Small Loan Act, because his hands are equally as unclean as those of the defendants; and the contracts here involved are illegal and unenforceable. However, it is contended on behalf of the complainant that these maxims have no application to the instant case and in support of that contention it is argued that the Small Loan Act is remedial in purpose, is to be liberally construed in favor of the borrower, and strictly construed *Page 544 
against the lender so as to effectuate such remedial purpose. There are undoubtedly numerous decisions of other jurisdictions which support this argument. Ordway v. Central National Bank,supra; Reagan v. District of Columbia, 41 App. D.C. 409;Winnick v. Aetna Acceptance Co., 275 Ill. App. 438; CashService Co. v. Ward (W.Va.), 192 S.E. Rep. 344; Westville Hamden Loan Co. v. Pasqual, supra; Smetal Corp. v. FamilyLoan Co. (Fla.), 161 So. Rep. 438; Grace v. McElroy, 1Allen (Mass.) 563; Solomon v. Dunne, 264 Ill. App. 415;Liberty Finance Co. v. Catterton (Md), 158 Atl. Rep. 16.
And that is the rationale of the New Jersey decisions.Consolidated Plan of New Jersey v. Shanholtz, supra; affirmed,107 N.J. Law 517; Richmond v. Conservative Credit System,supra; Union Loan Association v. Woodie, supra; IndependentLoan Co. v. Tyson, supra.
Such statutes are also held to be police regulations (In reHome Discount Co. (Ala. D.C.), 147 Fed. Rep. 538); and expressive of a public policy of the state. Independent LoanCo. v. Tyson, supra; Winnick v. Aetna Acceptance Co., supra;Westville Hamden Loan Co. v. Pasqual, supra; Lowe v.Loomis (Wis.), 14 S.W. Rep. 674; Smetal Corp. v. FamilyLoan Co., supra.
The small loan business is termed by counsel for the complainant a solution to a social problem, enabling the destitute and necessitous borrower to obtain small loans on reasonable terms — theretofore impossible because of the rapacity of unconscionable money lenders — and to have resulted from research by the Russell Sage Foundation. But whatever their source or intent, the small loan laws, in my judgment, merely provide a cloak of respectability for the modern Shylock and legalize unconscionable exactions in interest charges from those least able to pay them.
It is further argued that the Small Loan Act was enacted in the interest of the necessitous borrower, intended to afford the borrower of small loans the maximum of protection against the greed of the unconscionable money lender, and even from his own frailties, because necessitous persons "from the pressure of their distress are ready to come in to any terms with *Page 545 
their eyes open not only to break the law but complete their ruin" (Browning v. Morris, 2 Cowp. 791; 98 Eng. Rep. 1364); that the act places no duty whatever upon the borrower; does not prohibit or restrain him from doing anything; that the penalties of the act are directed solely against the lender; that the law should presume every payment made to such a lender as having been made through oppression and undue advantage, and that in interpreting and enforcing the provisions of the Small Loan Laws, and in granting relief to the borrower, the courts, both of law and equity, have subordinated the equitable doctrines of in paridelicto, unclean hands and "he who seeks equity must do equity" to the legislative fiat which provides for relief to the borrower and imposition of penalties upon the lender. There are undoubtedly many authorities lending color to this argument.Cone v. Russell Mason, supra; Martin v. Morales, 102 N.J. Eq. 535,536; Van Doren v. Staats (1811), 3 N.J. Law 448, [*]887, [*]893; Crossley v. Moore, 40 N.J. Law 27; Hintze v.Taylor, 57 N.J. Law 239; Brown v. McIntosh, 39 N.J. Law 22;Van Pelt v. Schauble, supra; Holman v. Johnson, supra;Browning v. Morris, supra; Williams v. Hedley, 8 East. 378;103 Eng. Rep. 388; Smith v. Bromley, 2 Douglas 696;99 Eng. Rep. 441; Reynell v. Sprye, 1 De Gex. M. G. 660, 679;42 Eng. Rep. 708; Clark v. Snee (1774), 1 Cowp. 197;98 Eng. Rep. 1041; Jones v. Barkley, 2 Doug. 684; 99 Eng. Rep. 434; Jacques
v. Golightly, 2 W. Black. 1073; 96 Eng. Rep. 632; Bosanquet v.Dashwood, Cas. T. Talbot 38; 25 Eng. Rep. 648; Duval v.Wellman, 124 N.Y. 156; 26 N.E. Rep. 343; Schroeppel v.Corning, 6 N.Y. 107, 116; Tracy v. Talmage, 14 N.Y. 162;Edgerly v. Hale, 71 N.H. 138; 51 Atl. Rep. 679; Irvin v.Curie, 171 N.Y. 407; 64 N.E. Rep. 161; 58 L.R.A. 830; Colby v.Title Insurance and Trust Co. (Cal.), 117 Pac. Rep. 913; 35L.R.A. (N.S.) 813; Bell v. Campbell, 123 Mo. 1;25 S.W. Rep. 359; MacRacken v. Bank of Columbus, 164 N.C. 24;80 S.E. Rep. 183; 49 L.R.A. (N.S.) 1043; B. O.S.W.R. Co. v.Hagan (Ind. S.G. 1915), 109 N.E. Rep. 194; Davis v.Atlanta Finance Co. (Ga.), 129 S.E. *Page 546 Rep. 51; O'Connor v. Ward, 60 Miss. 1025; Missouri K. T.Trust Co. v. Krumseig, 172 U.S. 351; 43 L.Ed. 474; Becker v.Wilcox, 81 Neb. 476; 16 L.R.A. (N.S.) 571; Ladd v. Barton,64 N.H. 613; 6 Atl. Rep. 483; Ferguson v. Sutphin, 8 Ill. 547;Tate v. Commercial Building Association, 97 Va. 74;45 L.R.A. 243; 33 S.E. Rep. 382; 11 Restatement of Law, Contracts 1120
¶ 604; 39 Cyc. 1030; Tyler on Usury 421; Webb on Usury ¶ 461; 13C.J. 497; Contracts ¶ 441; 6 R.C.L. 834; 12 Am. Jur. 734;Contracts ¶ 217-8; 1 Pom. Eq. Jur. 755 ¶ 403. Many of the early cases supporting this argument arose out of statutes against usury, gaming, bankrupt laws, and the like. The same doctrine has been applied in cases involving small loan laws.
Easy Term Loan Co. v. Silberman, supra, is cited by complainant in support of this argument, but it is not in point. That was an appeal to the Supreme Court from a judgment of a District Court of Newark, and only a question of evidence was before the appellate court. The court held the evidence objected to was competent as "it tended to establish that the transaction between the plaintiff and defendants was an attempt to circumvent the express mandate of the statute." The maxims referred to were not involved in that case.
In all of the cited cases where relief was granted it either appeared or was presumed that the applicant for relief was invinculis and not in pari delicto. And, of course, where there is oppression on the one side and submission on the other, or if one party is but an instrument in the hands of the other, the parties are obviously in vinculis and not in pari delicto.MacRacken v. Bank of Columbus, 164 N.C. 24; 80 S.E. Rep. 184;49 L.R.A. (N.S.) 1043; 13 C.J. 498 ¶ 442b. But it has been held that where the parties stand upon an equal footing neither has a remedy against the other (Bryant v. Peck,154 Mass. 460), and that this is so whether the contract is malumprohibitum or malum in se. Compton v. Bunker Hill Bank,96 Ill. 301; 36 Am. Rep. 147; Allison v. Hess. 28 Ia. 388:
In Browning v. Morris, supra, Lord Mansfield said: *Page 547 
"The rule is, in pari delicto, potior est conditiodefendentis; and there are several other maxims of the same kind. Where the contract is executed, and the money paid in paridelicto, this rule, as Mr. Dunning contended, certainly holds: and the party who has paid it, cannot recover it back. For instance, in bribery, if a man pays a sum of money by way of a bribe, he can never recover it in an action; because both plaintiff and defendant are equally criminal. But, where contracts or transactions are prohibited by positive statutes, for the sake of protecting one set of men from another set of men; the one, from their situation and condition, being liable to be oppressed or imposed upon by the other; there, the parties are not in pari delicto; and in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract. For instance, by the Statute of Usury to take more than 5% is declared illegal and the contract void. But these statutes were made to protect needyand necessitous persons from the oppression of usurious andmonied men who are eager to take advantage of the distress ofothers, whilst they on the other hand, from the pressure of theirdistress, are ready to come into any terms and, with their eyesopen, not only break the law, but complete their ruin. Thereforethe party injured may bring an action for the excess of interest.* * * And it is very material, that the statute itself, by thedistinction it makes, has marked the criminal; for the penaltiesare all on one side. * * * The man who makes the contract isliable to no penalty. So in usury, there is no penalty upon theparty who is imposed upon." (Italics mine.)
In Clark v. Shea, supra, the same distinguished jurist said:
"There are two sorts of prohibitions enacted by positive law, in respect of contracts. First. To protect weak or necessitous men from being over-reached, defrauded, or oppressed. There the rule in pari delicto, potior est conditio defendentis, does not hold — because where the defendant imposes upon the plaintiff itis not per delictum." (Italics mine.) *Page 548 
In Williams v. Hedley, supra (1897), Lord Ellenborough said:
"But although this rule applies (as was said by Lord Mansfield in Smith v. Bromley, Douglass, 696 N) `If the act be in itself immoral, or in violation of the general laws of public policy, yet in the case of other laws which are calculated for the protection of the subject against oppression, extortion and deceit,' Lord Mansfield lays down that `if such laws be violatedand the defendant take advantage of the plaintiff's condition or situation, then the plaintiff shall recover.'" (Italics mine.)
In Reynall v. Sprye, supra, Knight Bruce, L.J., said:
"But where the parties to a contract against public policy or illegal are not in pari delicto (and they are not always so),and where public policy is considered as advanced by allowingeither, or at least the most excusable of the two, to sue for relief against the transaction, relief is given to him, as we know from various authorities." (Italics mine.)
The result of the early English cases is summed up in a note toJones v. Barkley, supra (at p. 443), as follows:
"The inference to be drawn from the various decisions that have taken place on this subject * * * appear to be, that, the general principle remaining, that in pari delicto potior est conditiopossidentis, the two following exceptions to its application are also established:
"1. That where the illegality exists in the contract itself and that contract is not executed, there is a locus poenitentiae, the delictum is incomplete, and the contract may be rescinded by either party.
"2. That where the law which creates the illegality in the transaction was designed for the coercion of one party, and the protection of the other, or where the one party is the principal offender, and the other only criminal from a constrainedacquiescence in such illegal conduct, in these cases there is no parity of delictum at all between the parties, and the party so protected by the law, or so acting under compulsion, may at any time resort to the law for his remedy, though the illegal transaction be completed." (Italics mine.) *Page 549 
Professor Pomeroy (1 Eq. Jur. 756 ¶ 403) says:
"Assuming that a contract is fraudulent, or against public policy, or illegal, still where the parties to it are not inpari delicto, and where public policy is considered as advanced
by allowing either, or at least the most excusable of the two, to sue for relief, relief may be given. * * *"
And in the note (at p. 757) it is said:
"Among the ordinary instances where equity will set aside a fraudulent or illegal transaction at the suit of the partysupposed to be comparatively innocent, wholly on grounds of public policy, is the familiar case of a borrower suing to have the usurious contract and securities surrendered up and cancelled." (Italics mine.)
In Colby v. Title Insurance and Trust Co. (Cal. 1911),117 Pac. Rep. 913; 35 L.R.A. (N.S.) 813, the court said:
"It is true that, as a general rule, equity will not aid one party or another to an illegal transaction where they stand inpari delicto, but will leave them just where it finds them, to settle these questions without the aid of the court. * * * But this rule only applies where the parties are in pari delicto;
where the illegal transaction is entered into voluntarily and the turpitude of the parties is mutual. * * * Where, however, theparty seeking the relief is not a free moral agent, and hisconsent to the illegal transaction is obtained through duress,menace, or undue influence, he is not regarded as in paridelicto with the person obtaining his consent by the employment of such means, and will not be precluded from invoking affirmative relief in equity to set aside contracts or instruments so executed, or to defeat an attempted enforcement of them against him." (Italics mine.)
In Brown v. McIntosh, supra, it was held that money usuriously paid may be recovered, because the parties are not inpari delicto. Mr. Justice Reed there pointed out the common law distinction stated in the note to the case of Jones v.Barkley, supra, that:
"Where the law that creates the illegality of the transaction was designed for the coercion of one party and the protection of the other, or where one party is the principal offender and *Page 550 the other only criminal, from a constrained acquiescence in suchillegal conduct, in these cases there is no parity of delictum
at all between the parties. (Italics mine.)
After citing a number of the early English cases as examples of this rule, among which are Browning v. Morris, Jones v.Barkley, Jacques v. Golightly, Smith v. Bromley, Williams
v. Hedley and others, and quoting from some of them, he said:
"In each of these cases the prohibitions and penalties of the statute were levelled at a party who received the money, and the court recognized a distinction between his guilt and that of the party intended to be protected by the statutes, and so held them not in pari delicto."
"It is observable that the reasoning which relieves the payer of the character of particeps criminis, also takes his payment out of the operation of the rule relative to voluntary payments."
"No payment obtained through oppression or undue advantage is voluntary, and the law presumes every payment made to a personwho is by statute forbidden to receive it, where the statute isfor the protection of the payer, as made through oppression andundue advantage." (Italics mine.)
In this last quoted paragraph of Mr. Justice Reed's opinion, the fiction of law which is the sole support of the complainant's argument is succinctly stated.
In Van Pelt v. Schauble, supra (Court of Errors and Appeals), Dixon, J., said:
"But with regard to dealings such as that before us the legislature has put aside this judicial rule, by enacting the second section of the Gaming Statute, which declares that `any person who shall pay, deliver or deposit any money * * * upon the event of any wager or bet * * * may sue for and recover the same of the * * * person to whom the same shall be paid * * *."
While that case arose under the statute against gaming, the same principle was involved there as here.
In Davis v. Green, 91 N.J. Eq. 17, Leaming, V.C., said:
"The equitable maxim that he who comes into equity must come with clean hands is subject to well-defined limitations. *Page 551 
While the general rule is that where parties are in paridelicto no affirmative relief of any kind will be given to one against the other, that rule has always been regarded by courts of equity as without controlling force in all cases in whichpublic policy is considered as advanced by allowing either partyto sue for relief against the transaction. 2 Pom. Eq. Jur. 941."
(Italics mine.)
In Hintze v. Taylor, supra, the court (at p. 241), said:
"It is well settled that when a plaintiff is in pari delicto
with the defendant, money paid by the former to the latter cannot be recovered back. This rule applies where the act done is in itself immoral or a violation of the general laws of public policy, but it does not bar a recovery where the law violated isintended for the protection of the citizen against oppression,extortion or deceit." (Italics mine.)
This rule is quoted verbatim from the opinion of Lord Mansfield in Smith v. Bromley, supra, but the court omitted the following sentence: "If such laws are violated and thedefendant takes advantage of the plaintiff's condition orsituation, there the plaintiff shall recover." (Italics mine.) The italicized portion of the sentence above quoted indicates, I think, that the rule of the early English cases required a showing of advantage taken, oppression imposed, or deceit practiced. And that rule is implicit in the decisions of most American courts, of which the decision in Bell v. Campbell,123 Mo. 1; 25 S.W. Rep. 359, is a fair example. In that case the court said:
"The circumstances of this case clearly bring it within the operation of the principle that condemns and avoids a contract entered into where the obligor is not a free agent; where hestands a vinculis; where he is not equal to the task ofprotecting himself; where the circumstances which surround him atthe time are of such extreme necessity or of distress that hiswill is overcome, his free agency destroyed, by some oppressionor fraudulent advantage or imposition incident to thetransaction. In such case a court of equity will protect him by setting aside the contract thus made." (Italics mine.)
In Irwin v. Curie, supra, Parker, J., commenting on the leading case of Tracy v. Talmage, supra, said: *Page 552 
"The court, after a very careful review of the authorities, pointed out that where the contract is malum in se, thus involving moral turpitude, or violating some principle of public policy, the courts will in no case interfere to relieve either party from any of its consequences. But where the contract is merely malum prohibitum the court will interfere if the guiltrests chiefly upon one, although both have participated in the illegal act."
He then quoted from the Talmage Case, as follows:
"The maxim, said Judge Selden, `ex dolo malo non orituractio' is qualified by another, viz.: `in pari delicto meliorest conditio defendentis.' Unless, therefore, the parties arein pari delicto as well as particeps criminis, the courts, although the contract be illegal, will afford relief whereequity requires it to the more innocent party." (Italics mine.)
Bouvier says that "A person who is in pari delicto with another differs from a particeps criminis in this, that the former term always includes the latter, but the latter does not always include the former." Bouvier Law Dict. 882
A superficial reading of the cases establishing this exception to the rule of in pari delicto might lead to the conclusion that wherever the illegal contract is so because it is merelymalum prohibitum, the statute imposing a penalty upon but one of the parties for its violation, and having been enacted for the protection of one class of individuals from the oppression of another, the parties are conclusively presumed not to be in paridelicto. But a careful reading and consideration of these authorities will, I think, show that whether or not the parties are actually in pari delicto is always a question of fact for the jury, or the court when sitting without a jury. The fact that "the statute" as was said by Lord Mansfield, "has marked the criminal," is merely evidential; but it is not conclusive proof. This appears plainly, I think, from the language of Selden and Comstock, JJ., in the following quotations from Tracy v.Talmage, and of Brown, J., in Duval v. Williams, supra:
In the leading case of Tracey v. Talmage, supra, the court (Selden, J.) said:
"* * * In Browning v. Morris (2 Cowp. 790) Lord *Page 553 
Mansfield, after referring with approbation to the case ofJacques v. Golightly, reiterates the argument of Blackstone, J., in that case. He says, `And it is very material that the statute itself, by the distinction it makes, has marked the criminal, for the penalties are all on one side.' * * *
"It will be seen that these two cases are not like that ofSmith v. Bromley where an undue advantage was taken of the peculiar situation of the plaintiff; and that although some effort is made in Jacques v. Golightly, and by Lord Mansfield in Browning v. Morris, to bring them within the reasoning of that case, they are really placed upon the broad grounds that the parties are not in pari delicto, and, as evidence of this, the court rely upon the fact that the penalty was imposed upon the defendant alone.
"* * * These are the leading English cases on this subject; and it is plain that they do not rest solely upon the ground that the statute infringed was intended to protect one party from acts of oppression or extortion by the other."
On reargument, Comstock, J., said:
"The maxim `in pari delicto potior est conditio defendentis'
has never been applied to the case of a person contracting with a corporation, simply beyond the powers of the latter. * * * Aninstance might, no doubt, occur where the person dealing with acorporation might be shown to be an active and contriving agentin the unauthorized transaction. Then the law might leave himwhere it found him." (Italics mine.)
In Duval v. Williams, supra, it was held that money paid to a marriage broker may be recovered as obtained by constructive fraud, and the party who paid the money will not be regarded asin pari delicto with the marriage broker. There, commenting on the rule of in pari delicto, the court said:
"Public policy has dictated the adoption of this rule, but it has its limitations; and when the parties are not equallyguilty, or when the public interest is advanced by allowing themore excusable of the two to sue for relief, the courts will aid the injured party by setting aside the contract and restoring him so far as possible to his original position. * * * *Page 554 
 "The question in this and kindred cases therefore, must alwaysbe whether the parties are in equal guilt. Obviously cases might arise where this would clearly appear, and where the court would be justified in so holding as a matter of law; * * * We are of the opinion, therefore, that it was error to hold as a legalconclusion that the parties to the contract in question were equal in guilt. * * * It is true there is no evidence of actual overpersuasion or undue influence, but at most the inferences tobe drawn from these facts were for the jury. * * * If the evidence was not sufficiently strong to authorize the court to hold as a question of law that the parties were not in paridelicto, it at least presented a mixed question of fact and law for the jury." (Italics mine.)
In the case of Lowell v. Boston Lowell Railroad Co., 23Pick. 24, where the objection was raised that the parties wereparticeps criminis, the court said:
"In respect to offenses in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and courts will not inquire into their relative guilt. But wherethe offense is merely malum prohibitum, and is in no respectimmoral, it is not against the policy of the law to inquire intothe relative delinquency of the parties, and to administer justice between them, although both parties are wrongdoers." And in Tracy v. Talmage, supra (at p. 188), Judge Selden said:
"It will be seen * * * that the penalties are imposed exclusively upon the corporation violating the provisions of the act, and upon its officers and members. So far, therefore, as the defense is based upon a violation of the Restraining Act, there is that statutory designation of the guilty party upon which most of the cases to which I have referred are made to rest. * * * The imposition of the penalties for a violation of the restraining law upon the corporation alone does not make it the guilty party, but it is simply evidence that the legislature so regarded it." (Italics mine.)
Mr. Justice Story (2 Story Eq. Jur. 310, ¶ 298), says
"Lord Thurlow, indeed, seems to have thought, that in all cases where money had been paid for an illegal purpose, it might be recovered *Page 555 
back, observing that if courts of justice mean to prevent the perpetration of crime, it must be, not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before. But this is pushing the doctrine to an extravagant extent, and effectually subverting the maxim, in pari delicto est conditio defendentis.
The ground of reasoning, upon which his lordship proceeded, is exceedingly questionable in itself; and the suppression ofillegal contracts is far more likely, in general, to beaccomplished by leaving the parties without remedy against eachother, and by thus introducing a preventive check, naturally connected with a want of confidence, and a sole reliance upon personal honor. And so, accordingly, the modern doctrine isestablished. Relief is not granted where both parties are trulyin pari delicto, unless in cases where public policy wouldthereby be promoted." (Italics mine.)
In Collins v. International, c. (Court of Chancery, 1935),119 N.J. Eq. 230, 239, where payments of $100 to $500 were exacted from union members by the officers for preferred jobs, and members from whom such extortions had been made sought an injunction against the continuance of the practice and an accounting for the moneys thus extorted, it was held that complainants were entitled to an injunction but not to an accounting as the parties were in pari delicto, and "it is the established rule that the law will not assist either party to an illegal contract * * * it will leave them where it finds them" (citing Cameron v. International Alliance, c., 118 N.J. Eq. 11), and the court said:
"It is urged that as the public interest is here involved this case comes within the exception to the rule quoted. The exception is based upon `the reasons * * * that the public interest requires that relief should be given; and it is given to the public through the party.' Story Eq. Jur. (14th ed.) ¶ 421.
The public interest is amply served by an injunction against a continuance of the unlawful practice; an accounting for the graft paid would benefit no one except guilty parties."
It is certainly no part of the public policy of this state to encourage the perpetration of fraud upon its laws or statutes, or to reward a fraud doer for his perfidy. Nor should equity put a premium on venality. Professor Pomeroy (2 Pom. Eq. Jur. 1984
¶ 937) says: "Equity will never assist a party to carry into effect his own intentional violation of the law."
In 13 C.J. 497, the text reads: *Page 556 
"But courts are and should be cautious in affording relief to a fraudulent debtor or other violator of the law under this exception, and should act only where it is evident that some greater public good can be subserved by action than by inaction."
In Petrie v. Hannay, supra, Lord Kenyon said:
"Those who come into a court of justice to seek redress must come with clean hands and must disclose a transaction warranted by law."
A careful examination of the authorities will show, I believe, that this exception to the application of the rule of in paridelicto, and the presumption that the borrower of a usurious loan is not in pari delicto with the lender, is founded upon a mere fiction of law — a presumption that the borrower is always the oppressed victim of circumstance and the slave of the lender.Brown v. McIntosh, supra. This fiction had its origin in the archaic rule which prohibited all interest, excluded the usurer from the altar, denied him absolution in the hour of death and a Christian burial after death. It also finds support in that peculiar doctrine, advanced by some of the Fathers of the Church in the fifteenth century, that "Jews might be allowed to take interest since they were to be damned in any case, and by giving them a monopoly of the business the souls of Christians might not be lost." See Liegois, Histoire de L'Usure, 82, cited inMarshall v. Beeler, 104 Kan. 32; 178 Pac. Rep. 245 (which see for an interesting discussion of the ancient rules applicable to usury (interest) and the development of the modern law of usury). But must this fiction be forever indulged in regardless of the facts of the particular case? I think not. Fact is not only stranger, but stronger than fiction. I am aware of the distinction between a legal fiction and a legal presumption as stated by the text writers (22 C.J. 82; 25 C.J. 1086; Black,L.D. 495; Bouvier, L.D. 411), but I believe I am correct in the use of the term "fiction" here, because, by a fiction of law "something known to be false * * * is assumed to be true" (28C.J. 82), and the evidence shows that an assumption of complainant's innocence would be a patently false one. However, it is probably of small moment whether we refer to the presumption mentioned in Brown v. McIntosh as a fiction of law or a presumption of law. Neither fiction nor presumption *Page 557 
can prevail over fact. In Johnston v. Smith, 2 Barrow 962;97 Eng. Rep. 654, Lord Mansfield said: "the only question was, whether the truth of the fact could * * * be averred contrary to the fiction of the law." * * * "The court could not endure that a mere form or fiction of law, introduced for the sake of justice, should work a wrong, contrary to the real truth and substance of the thing." See, also, 25 C.J. 1086; United States v. 1960Bags of Coffee, 8 Cranch (U.S.) 398, 415; 3 L.Ed. 602.
Presumptions merely shift the burden of proof (22 C.J. 79), are indulged in only to supply facts, and do not arise where the facts are known. 22 C.J. 83; and "as a practical matter every presumption is rebuttable by proof that the facts are actually otherwise."
"Presumptions * * * are artificial rules which have a legal effect independent of any belief, and stand in the place of proofuntil the contrary be shown." 2 Strobh. 141, 147.
"Presumptions * * * may be looked on as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts. * * * presumptions have no place in the presence of the actual facts disclosed to the jury." Woskowik v. KansasCity, St. J. C.S.R.R. Co., 196 Mo. 550, 571; 94 S.W. Rep. 256.
Professor Wigmore (5 Wigmore, Evidence, ¶ 2492) says: "In strictness there cannot be such a thing as a conclusive presumption." And see paragraph 2491. In Robinson v.Robinson, 83 N.J. Eq. 150; affirmed, 84 N.J. Eq. 201,
Vice-Chancellor Leaming said:
"It is impossible to predicate judicial action upon a presumption which is wholly repelled by the evidence."
Presumptions are merely substitutes for evidence, and both presumption and fiction are resorted to simply for the furtherance of justice. Neither will be permitted to work any wrong to the individual or the state.
The fiction or presumption that Ryan is not in pari delicto
cannot stand up against the overwhelming facts here disclosed. Ryan knew as well as Devine and his superiors that the contracts were illegal. Out of his own mouth it appears that he was familiar with the Small Loan Act and its limitations. *Page 558 
He had previously operated a used car business in Florida and had borrowed moneys from small loan companies there. He was not in the position of the ordinary borrower who participates in an illegal transaction believing it to be legal. In the usual case of evasion of the statute by subterfuge, the borrower is led by the lender to believe that the devices by which the strict provisions of the act are avoided make the transaction legal — that certain methods of evasion are entirely within the law. But that is not the case here. Both parties knew that the contracts were void under the statute — there was no pretense of legality on either side. The methods adopted were not to validate the contracts, but to cover up their invalidity and to make it appear to the casual observer, or to representatives of the Department of Banking and Insurance, that all was in conformity with the law, when, in fact, as both parties knew, it was not — and not so intended. The intent was to violate and conceal.
In Brooks v. Cooper, supra, the court said:
"Now, the intention of the contract was to contravene the statute, * * * This renders the contract vicious and unenforceable. An agreement to contravene a statute in fraud ofthe public, or to the injury of private parties, savors of aconspiracy." (Italics mine.)
That the parties to this suit conspired to contravene the statute, to perpetrate a fraud on the law, admits of no doubt. It has been so found by this court, and by a jury in a court of law. However remedial our Small Loan Act may be, or whatever may have been its purpose, it was certainly not designed to reward or encourage fraud. The underlying reason for the drastic provisions of the act for the protection of the borrower is his credulity and susceptibility to oppression by reason of his necessitous circumstances. It was that class of borrowers the statute was designed to protect. It was not designed to protect the criminally minded — those borrowers who were not motivated in their transactions by distress and necessity. Certainly not to protect a man like Ryan who was not under the pressure of want or necessity, who was not the type susceptible to oppression, but who voluntarily entered into a conspiracy with the defendants to commit *Page 559 
a fraud upon the act and defeat its provisions. Ryan was prompted by his desire to do business on a large scale; the defendants by their desire for a ready market for their repossessed cars and their greed for thirty per cent. interest. Both parties entered into the nearly 500 transactions with their eyes wide open, with full knowledge of the law, and a deliberate purpose to set at naught the provisions of the act. It is true that the penalties of the act seem to be directed solely to the lender, and the advantages or benefits, aside from the provisions permitting an outrageous interest charge by the lender, reserved solely for the borrowers. But these penalties were designed to prevent oppression of the weak and poor; they were not designed as rewards for the perfidy of the borrower. Where no oppression is involved, no advantage taken by the lender of the borrower, the transaction being entered into with the deliberate purpose of defeating the statute, the parties are both particeps criminis
and in pari delicto, and the rule and not the exception applies. Certainly it was not the intention of the legislature to preclude the courts, in such cases, from finding as a fact that the parties were in pari delicto. It was not intended that the hand of the court should be forced, or that it should be stayed in the application of the fundamental principles of justice.
In Prindiville v. Johnson Higgins, supra (Court of Errors and Appeals, 1922), Gummere, C.J., speaking for the Court of Errors and Appeals, said:
"The complainant, according to the averments of his bill and the undisputed facts set out in the answer and developed by the proofs, came into the Court of Chancery for the purpose of having it there declared that a scheme, in the execution of which he was an active participant and the recipient of very large sums of money, was a fraud upon our statute, a violation of our public policy, and, therefore, null and void, and sought to have an adjudication in his favor, based upon these facts, in order that he may now enjoy the benefits which can only come to him as a result of such an adjudication. Stated, shortly, his position is this: having for some eight years participated in the carrying out of this fraudulent scheme and reaped the benefit thereof, he now seeks, either *Page 560 
for his own personal benefit or as the self-constituted representative of the state, to have this fraudulent scheme ended and our state laws and policies vindicated.
"So far as the vindication of our laws and policies is concerned, it is enough to say that the state does not need his aid for any such purpose, and that his assumed status as a representative of the state cannot be recognized.
"If we consider him as a mere individual, seeking to repudiate for his own personal advantage a fraud upon the state in which he was so long a participant, it is entirely settled that the Court of Chancery is not open to him for any such purpose. It is a maxim of equity that a court of conscience will not even listen to a suitor who comes into that tribunal with unclean hands, and this doctrine is applicable whenever it appears that the litigant seeks to be relieved of the consequences of a fraud in which he has been an active participant. The courts of this state have steadfastly refused to lend their aid to a wrongdoer either by the enforcement of an illegal contract or by relieving the wrongdoer from the obligations thereof; and this they do, not out of regard for the defendant in the action, but because of their unwillingness to use the powers which were granted to them for the furtherance of lawful ends in aiding schemes which are in their nature venal, or for the purpose of relieving parties from the liabilities which such schemes create."
I am unable to see any difference in principle between that case and the one now before the court. There, the complainant had participated in a scheme which was a fraud on the statute — it is the same here. There, the acts were in violation of our public policy and therefore null and void — it is the same here. The language of the Chief-Justice in that case might well be paraphrased thus for the purposes of this case: "Having for about two years participated in the carrying out of this fraudulent scheme and reaped the benefit thereof, he now seeks * * * for his own personal benefit * * * to have this fraudulent scheme ended and our state laws and policies vindicated. So far as the vindication of our laws and policies is concerned, it is enough to say that the state does not need his aid for any such purpose. * * * *Page 561 
If we consider him as a mere individual, seeking to repudiate for his own personal advantage a fraud upon the state in which he was so long a participant, it is entirely settled that the Court of Chancery is not open to him for any such purpose."
The last paragraph of the opinion may be quoted verbatim and applied here. Ryan is not only seeking to be relieved of the consequences of a fraud in which he was long an active participant, but he is also seeking to obtain the benefits of the very statute which is the subject of his fraud. A moment's appraisal of just what is sought by Ryan in this suit is sufficient to shock the conscience of the court and close its door against him. He claims to have paid the defendant companies more than $50,000 on account of the 472 illegal loans. At the time of the accounting between the parties there remained a balance of over $28,000 unpaid, of which balance some $13,000 was realized by the sale of the automobiles taken in replevin. Ryan asks that he be rewarded for his perfidy by a decree of this court compelling the defendants to repay him from $50,000 to $63,000, and relieving him of the remaining obligations; and this notwithstanding the fact that what he has paid obviously came from the sale of the automobiles purchased from the defendants and for which his notes were given in payment. He asks a reward of $50,000 to $63,000 for his fraud on the statute. He is entitled to relief on his outstanding contracts to the extent that it is afforded to him by a refusal to entertain the defendants' counter-claim. He is not entitled, in this court, to any reward for his perfidy. Nor are the defendants rewarded by denying reward to the complainant. They lose about $16,000 as a result of their fraud, which is a punishment to fit their crime; and under the statute they are liable to indictment for misdemeanor. If it be said that Ryan is not seeking reward for his perfidy but only the enforcement of a substantive right given him by the statute, as was said in Missouri K. T. Trust Co.
v. Krumseig, supra, the answer is that he has forfeited that right by his deliberate fraud, and the act was not designed to encourage fraud. Had the legislature *Page 562 
intended to prevent the court from making any inquiry as to the relative guilt of the parties to transactions such as are here involved, it could have said so in plain language as has been done by the legislature in other jurisdictions. See Kansas Laws1860 ch. 75 ¶ 3, referred to in Marshall v. Beeler, supra.
That the conclusion at which I have arrived is not without precedent appears from the decision of the Illinois Appellate Court in Mills, Administratrix v. First State Pawners'Society (1915), 192 Ill. App. 231. In that case the plaintiff administratrix sought to replevin certain pledges of her decedent for excess loans. The statute prohibited loans in excess of $250 and gave the borrower a right of action to recover pledges on excess loans. Plaintiff's decedent owed defendant over $8,000 at the time of his death on loans obtained on fictitious names, although no single loan was in excess of $250. It was held that the plaintiff was not entitled to recover because the parties to the transaction were in pari delicto. The statute there involved was section 16 of the Pawners' Society Act of March 28th, 1899 (as it stood in 1931, per Cahill Ill. Rev. St.1931):
"If any corporation organized under this act shall, as a condition of redemption, or for making the loan, or otherwise, in any way or for any purpose, charge to the pawners or pledger any sum in excess of the amount herein authorized to be charged, such corporation shall thereby forfeit all claim to, or lien upon, such pawn or pledge, and it shall deliver such pawn or pledge on demand to the pawner or pledger, his legal representatives or assigns, and in default of so doing such pawners or pledger, or his legal representatives or assigns, may recover the possession of such pawn or pledge by the action of replevin, or, at his election, may recover from such corporation the value of such pawn or pledge in an action at law therefor; any willful violation of this act by any corporation organized under it, by which any person shall suffer or sustain any loss or damage shall forfeit its right to do business, and the Attorney-General of the State shall take the necessary legal steps to wind up and discontinue its business; any director, officer or employee of any corporation organized under this act who shall charge, take or collect or receive any compensation on a loan beyond or in excess of the charges herein allowed, shall be guilty of a misdemeanor and be fined not to exceed ($100) one hundred dollars, or be imprisoned in the county jail for not more than six months or both." *Page 563 
After reviewing many of the cases involving the application of the maxim "in pari delicto," including the English authorities, the court said:
"But the principle on which recovery is allowed in that class of cases has no application here. P---- (plaintiff's decedent) was under no restraint or oppression; rather he was the aggressor in a deliberate scheme to violate a positive statute and thwart its purpose. In such a case the law lends no assistance to the wrongdoer or to those relying on his turpitude."
That case is on all fours with this, and I believe the decision to be sound and just. There is no difference in principle between the statute there involved and that involved here. Nor are the facts of the two cases unlike except that here the illegal loans aggregated some $75,000 as against $8,000 there. Loans on fictitious names to cover up the fraud on the statute was a factual feature there as well as here. I do not consider the decision of the New Hampshire Supreme Court in Burque v.Brodeur, 158 Atl. Rep. 127, to be contra, or, if so, controlling. That case was decided upon the principles of suretyship, and it was held that the makers of the notes who were merely sureties, were not liable thereon because the principal debtor had been discharged by operation of law. The maxims referred to were apparently not involved.
I have made a rather exhaustive examination of the authorities on the issues involved in this suit, and I have no hesitancy in saying that I believe few, if any, decisions, can be found which hold that the fiction of law which is the sole foundation for complainant's claim of reward for his fraud, can prevail over the truth. If there are any such, they are not binding on this court. I have found none, nor have counsel referred me to any.
I will advise a decree dismissing both the bill and the counter-claim. *Page 564